**UNITED STATES of America,**
**Appellee,**

v.

**George ROBINSON, Defendant-Appellant.**

**No. 429, Docket 28882.**

United States Court of Appeals
Second Circuit.

Argued April 30, 1965.

Submitted to the In Banc Court
May 26, 1965.

Decided Nov. 22, 1965.

Waterman, J. Joseph Smith, and Anderson, Circuit Judges, dissented.

See also 2 Cir., 325 F.2d 391.

John T. Curtin, U. S. Atty. for the Western District of New York, Buffalo, N. Y., for appellee.

Joel M. Handel, New York City (Anthony F. Marra, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and ANDERSON, Circuit Judges.

LUMBARD, Chief Judge.

On this second appeal from his conviction in the United States District Court for the Western District of New York for possession of narcotics and conspiracy in violation of 21 U.S.C. § 174, George Robinson urges for the first time that it was error to receive in evidence at his trial an oral statement made to a federal

narcotics agent that some of his money had been used to purchase heroin found on his companion by the Buffalo, New York, police. The statement was elicited at a Buffalo police station to which Robinson and his companion had been taken so that their persons and their baggage could be searched for narcotics. Prior to making the admission, Robinson had not been advised that he was entitled to remain silent, that anything he said might be used in evidence, and that he had a right to counsel.

◼ Robinson's only objection to this evidence at trial and on the first appeal was that it stemmed from an illegal arrest and search, but he now claims that, in view of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the statement was received in violation of his Sixth Amendment rights. Robinson also urges, as he has at trial and throughout, that there was insufficient probable cause for the arrests and subsequent search by the Buffalo police. After a panel of this court had heard argument, the active circuit judges, *sua sponte* on May 26, 1965, ordered *in banc* consideration of this case and six other cases which involve related questions of importance to the administration of criminal justice. We hold that there was probable cause for the arrests and that Robinson's statement was properly received into evidence, and we affirm the conviction.

Robinson was tried together with his companion, Annita Daniels, and both were convicted of possession of heroin and conspiracy. Although we have granted the government's motion to dismiss Daniels' appeal for failure to prosecute,[1] we set forth the facts relating to both Robinson and Daniels as they are relevant to Robinson's claims.

At about 10:40 A.M. on September 17, 1962, Edward J. Clohessy and Pat Quale of the Buffalo Police Department spotted Robinson and Daniels on Michigan Avenue carrying luggage toward their home three-and-one-half blocks away. The police had been alerted about an hour earlier by Federal Narcotics Agent Salvatore J. Giovino that Robinson and Daniels were expected back that day from New York City with narcotics. When Daniels stated that she and Robinson had just returned from New York, the officers asked Robinson and Daniels to accompany them to headquarters. In our first decision in this case, we agreed with the trial judge that this was an arrest. We remanded for a further hearing as to probable cause for the arrest because the trial court had not permitted defense counsel to inquire into the identity and reliability of Agent Giovino's informant and because there was insufficient corroborating evidence to justify the arrest unless the informant was disclosed and the reliability of his information was established. United States v. Robinson, 2 Cir., 325 F.2d 391 (1963). At the subsequent hearing, Agent Giovino and the informant, Javan Corley, were extensively examined. Judge Henderson made detailed findings of fact, fully supported by the record. He held that there was probable cause for the arrest because Agent Giovino had ample reason to consider Corley a reliable informant. Accordingly, the court entered a new final judgment of conviction from which Robinson takes this appeal.

At the hearing, Javan Corley testified that he had known Annita Daniels as a narcotics addict and sometime peddler for a number of years. For many weeks prior to September 17, 1962, Corley and his "girlfriend," Toni Freeman, who was an addict, had purchased narcotics daily from both Robinson and Daniels at their residence. Two or three days before September 17, Corley and Freeman had gone to the Robinson-Daniels apartment to purchase a "spoon" (¼ ounce) of heroin; when they asked for credit Robinson said he needed all the cash he could get as he was going to "the city," mean-

---

[1]. The record reveals that Daniels was committed to the United States Public Health Service Hospital in Lexington, Kentucky, in December 1962. She has been serving her five-year sentence since that time.

ing New York City, where many Buffalo peddlers went to get their narcotics. To Corley, who knew that Robinson had made previous trips to New York to purchase heroin and that Robinson had been in short supply earlier in September, "it was clear that Robinson intended to travel to New York City to buy narcotics." During the next two or three days, Corley went to the Robinson-Daniels residence three times but found no one home. On the last visit an upstairs neighbor, whom Corley had seen in the Robinson-Daniels apartment on earlier occasions, told Corley that their return was imminent. Corley then called Agent Giovino and told him that Robinson and Daniels would soon be returning from New York City with narcotics. Giovino immediately telephoned the Buffalo police who picked up Robinson and Daniels on Michigan Avenue.

The evidence at the hearing amply supports Judge Henderson's finding that Agent Giovino was fully warranted in considering Javan Corley a reliable informant. Giovino knew that Corley was a former user and peddler of narcotics who at that time was generally accepted in the Buffalo narcotics community. Prior to September 17, 1962, Corley had given Agent Giovino information relating to local drug activity which in one instance led to arrest and conviction of a narcotics peddler. In another instance prior to the Robinson-Daniels arrest and known to Agent Giovino, Corley had introduced a peddler to an undercover agent, and purchases by the agent led to an arrest and conviction. In addition, other information previously supplied by Corley had been independently verified, and in no case had Agent Giovino found that Corley's information was not accurate. Indeed, prior to September 17,

Agent Giovino had applied to have Corley hired by the Bureau of Narcotics as a "special employee" (paid informant); authorization for Corley's appointment was received by Agent Giovino the very day Robinson and Daniels were arrested.

Under these circumstances, the Buffalo police officers had probable cause for the arrest of Robinson and Daniels. This case is strikingly similar to Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in which the Supreme Court held that federal narcotics agents had probable cause to arrest for a violation of 21 U.S.C. § 174 when a reliable "special employee" carefully described a suspect to the agents and related that the suspect would be returning to Denver by train within a day or two carrying three ounces of heroin. In Draper, the informant died four days after the arrest and therefore did not testify, but the Court still found the arresting officers' actions justified. Here, we have ample evidence that Corley had proven himself reliable in the past. In addition, Corley's own testimony at the hearing indicates that his belief that Robinson and Daniels would be returning to Buffalo with narcotics was entirely rational. Agent Giovino had sufficient knowledge both of Corley's reliability on other occasions and of Corley's basis for inferring that Robinson and Daniels would be returning with narcotics to justify Giovino's call to the Buffalo Police Department requesting an immediate arrest. Probable cause demands no more. See United States v. Jones, 362 U.S. 257, 267–271 (1960).

The major difference between this case and Draper is that here the arrest by Buffalo police officers must be justified under state law.[2] United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.

2. The federal agents making the arrest in Draper acted under 26 U.S.C. § 7607, which provides that an agent of the Bureau of Narcotics may make arrest without warrant "for violations of any law of the United States relating to narcotic drugs * * * where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation." The terms "probable cause" as used in the Fourth Amendment and "reasonable grounds" as used in this statute "are substantial equivalents of the same meaning." Draper v. United States, 358 U.S. at 310 n. 3, 79 S.Ct. at 331.

Ed. 210 (1948). But, as we pointed out in our first opinion, 325 F.2d at 394–395, there was probable cause for arrest under the New York Code of Criminal Procedure, § 177(4) [3] so long as Agent Giovino's informant was reliable. Officers Clohessy and Quale knew the defendants by sight (unlike the situation in Draper where the informant had to describe the suspect) and knew that Daniels was an addict and that Robinson had a prior narcotics conviction. When the officers confirmed that Robinson and Daniels were returning from New York as Agent Giovino had informed them, arrest without a warrant was justified.[4] People v. Coffey, 12 N.Y.2d 443, 240 N.Y.S.2d 721, 191 N.E.2d 263 (1963), cert. denied, 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964), upheld on collateral attack, United States ex rel. Coffey v. Fay, 344 F.2d 625 (2 Cir. 1965).

We now turn to the question whether Robinson's incriminating statement made after his arrest should have been admitted at trial and to the events leading up to that statement. When Officers Clohessy and Quale first spotted Robinson and Daniels at 10:40 A.M. on Michigan Avenue walking toward their nearby home, Robinson was carrying two large suitcases and Daniels a small suitcase and a shopping bag. When Quale asked them what they were doing with the suitcases, they said that they had come from New York and had just gotten off the bus from Rochester at Michigan Avenue and Main Street. Clohessy then told them he had information that they were "dirty" (i. e., carrying narcotics); Robinson and Daniels protested that they were "clean" and had not brought back anything from New York. The officers instructed Robinson and Daniels to accompany them to police headquarters where a search could be made. On the way to the police headquarters, both defendants repeatedly suggested that they be searched then and there but the officers declined, reminding Daniels that she must be searched by a matron at the station.

The group arrived at police headquarters about 11:00 A.M. and Robinson and Daniels were taken to separate rooms to be searched. Daniels now resisted the attempt of a policewoman to search her and it was necessary to summon two police officers to hold her while her person was searched. During the ensuing struggle in which Daniels bit the policewoman and one of the officers, the policewoman found secreted in her bosom a package containing 91 glassine envelopes of heroin. In the other room in the presence of Robinson, Officer Quale found measuring spoons, a roll of scotch tape, and empty glassine envelopes identical to those found on Annita Daniels in one of the suitcases which Robinson had been carrying when he was arrested.

Meanwhile Agent Giovino had been advised of these developments. He arrived at police headquarters about 11:45 A.M. just as the search was completed. About 12:00 noon he had a brief conversation

---

3. New York Code of Criminal Procedure, § 177(4), effective September 1, 1958, provides that:
   "A peace officer may, without a warrant, arrest a person, * * *
   4. When he has reasonable cause for believing that a felony has been committed, and that the person arrested has committed it, though it should afterward appear that no felony has been committed, or, if committed, that the person arrested did not commit it; * * *."
   Unlawful possession of narcotics is a felony under New York law as well as federal law. N.Y.Penal Law, § 1751 (McKinney Supp.1964).

4. See Cervantes v. United States, 263 F.2d 800, 804 n. 6 (9 Cir. 1959). In Cervantes, an undisclosed informant reported that the defendant would be returning from Mexico with narcotics. No arrest was made, but Cervantes was arrested ten weeks later when he was returning from another trip to Mexico about which the police had no additional information. The court found that there was no probable cause for that arrest; this is clearly distinguishable from the instant case where Robinson and Daniels were arrested while returning from the specific trip that Corley had discussed with Agent Giovino.

with Robinson in which he asked about the heroin found on Daniels and the paraphernalia in Robinson's suitcase. Robinson then admitted that he had put up some of the money to buy the heroin. The statement was made in answer to routine and casual questioning before which Robinson was not warned of his right to remain silent or that what he said might be used in evidence. He was not advised of his right to counsel and he did not ask to consult counsel even though he had had previous experience with the criminal law.[5]

After Agent Giovino had talked with Robinson, he placed a call to the United States Commissioner. When he was advised that the Commissioner would not be available for an arraignment until after 2:00 P.M., Giovino went to lunch. He returned about 1:30 P.M. and left promptly with the Buffalo officers and the defendants for the Commissioner's office for arraignment. On the way to the Commissioner's office, Giovino talked with Daniels. She admitted that she had purchased the narcotics in New York City and that she and Robinson had pooled their money for the purchase. After arrival at the Commissioner's office, Agent Giovino dictated to a stenographer in Daniels' presence the statements that she had made. After a statement was typed, she signed it.[6] Daniels was not advised of her right to remain silent and that what she said might be used in evidence until the statement was typed and ready to be signed; nor was she advised of her right to counsel. The defendants were arraigned at about 2:30 P.M.

There has been no claim at any stage of these proceedings that the statement elicited from Robinson was involuntary;[7] nor has there been any claim that Robinson's statement was elicited during a period of unnecessary delay prior to arraignment in violation of Rule 5(a), Federal Rules of Criminal Procedure, and we need not consider this question. See United States v. Torres, 343 F.2d 750 (2 Cir. 1965).

The brief and casual questioning of Robinson by Narcotics Agent Giovino, although done at Buffalo police headquarters, had none of the aspects of extended interrogation or incommunicado detention present in Escobedo v. State of Illinois, supra, and in those cases in which the Supreme Court has excluded involuntary confessions. E. g., Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). The Buffalo police had probable cause to arrest Robinson and Daniels for possession of narcotics and to search their persons and luggage for evidence of such a crime. It was incumbent upon them to perform this search at a police station despite the defendants' request for a search on the street. Narcotics and the implements with which it is sold and used are small items that can be secreted in numerous places on the body; an adequate search quite obviously required greater privacy than the street corner. More important, Annita Daniels was a woman and the arresting officers were men. It would have violated police regulations and all concepts of decency, as the defendants well knew when they requested an immediate search, if the officers had attempted a thorough search at the place of arrest. And the possibility of resistance to a search of this kind, which was in fact made by Daniels in the police

5. Robinson previously had been arrested and convicted for a narcotics violation.

6. Robinson refused to give Agent Giovino an additional statement during this trip to the Commissioner's office. The trial judge properly instructed the jury that the statement of Daniels was not to be considered against Robinson. See Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

7. There has been no claim that Robinson's statement was untrue. Neither Robinson nor Daniels testified in their behalf at trial. Although Daniels did testify during a pre-trial hearing on a motion to suppress evidence taken in the search, there was no testimony contradicting the substance of the statements of the defendants to which Agent Giovino had testified.

station, would by itself be sufficient reason for taking the two defendants to the station house for purposes of search.

Thus the presence of Robinson at the police station at the time of the questioning was necessary and was not part of a plan to elicit incriminating statements in an atmosphere of oppression and coercion. Moreover, Robinson's statement was elicited by Agent Giovino, who was not a member of the Buffalo police force or the arresting team and who enlisted no aid from the police officers present at the station. Under these circumstances, the questioning by Agent Giovino parallels the prompt and on-the-street questioning of Richard Cone and the reasons which we found persuasive in upholding the action of the federal agents in United States v. Cone, 2 Cir., 354 F.2d 119 also decided today, apply with equal force here.

When Agent Giovino learned the results of the arrest of Robinson and Daniels that he had requested, he was under a duty to question the defendants at the Buffalo police station. The information supplied by his informant had at this point led to the discovery and seizure of narcotics on the person of a known Buffalo addict and peddler, Annita Daniels. It thus became of paramount importance for Giovino to find out who had participated in the transportation of the heroin and from whom and where it had been obtained. To seek additional information from Daniels and also from her known companion Robinson immediately upon the discovery of the incriminating evidence, assuming that the circumstances were not coercive or intimidating, was a natural adjunct of Agent Giovino's office.

More important, as to Robinson, questioning was vital to determine whether he should be charged with a crime. Although there was probable cause for the arrests and search, no charges could have been brought against the defendants had narcotics not actually been found in their possession. When narcotics were found on Daniels, the circumstantial evidence implicating Robinson was strong due to his long association with Daniels, the fact that he had accompanied her to New York City, and the fact that narcotics paraphernalia had been found in a suitcase seized from him. Of course it was possible that Robinson could have been totally ignorant regarding the narcotics in Daniels' possession. Under the circumstances the only proper procedure was for Agent Giovino to question Robinson immediately. That Robinson voluntarily chose to answer and thereby incriminate himself does not make his answer *per se* inadmissible.

■■ Even assuming that there was sufficient circumstantial evidence to charge Robinson before his admission, some questioning of Robinson was necessary so that Agent Giovino could better decide what the charge should be. Robinson's long association with Daniels (who referred to him as her "old man") might have made a charge of constructive possession of the narcotics found on Daniels appropriate. But constructive possession requires dominance and control over the possessor, United States v. Rosario, 327 F.2d 561 (2 Cir. 1964), and there was the alternative possibility that Robinson had violated 21 U.S.C. § 174 merely by providing money with which Daniels had purchased the narcotics. When an arrest is validly made without a warrant, as in this case, it is particularly necessary that the police be permitted a questioning period of reasonable duration so that an informed decision to charge can be made. As we have today pointed out in United States v. Cone, 354 F.2d 119, to deny to the police or to federal agents such a routine method of screening the innumerable suspects who pass through their hands by prohibiting use of the fruits of questioning when they have reason to believe a crime has been committed, regarding which a suspect is likely to have some knowledge, would be an unrealistic obstruction that would tax the investigative resources of law enforcement agencies immeasurably and reduce the efficiency of crime pre-

vention and detection to a degree which would seriously endanger public safety.

George Robinson was subjected to casual and non-coercive questioning. He was validly arrested, transported to police headquarters, searched, booked and questioned within a period of less than two hours. His voluntary statement was elicited in the course of necessary investigation by the Narcotics Agent. Immediately upon the discovery of sufficient evidence to justify his arraignment on charges of violating the federal narcotics laws, Agent Giovino called a United States Commissioner. We find nothing in the actions of the federal agent or the police or in Escobedo v. Illinois which requires us to reverse his conviction because this admission was received in evidence.

Affirmed.

MOORE, FRIENDLY, KAUFMAN and HAYS, Circuit Judges, concur.

WATERMAN, Circuit Judge (dissenting):

I dissent.

This case is fundamentally different from United States v. Cone, also decided today, for the reasons so ably stated by my brother Anderson in his dissent to the opinion of the court in the present case, in which, as stated by him, I fully concur. See my concurring opinion in United States v. Cone, 354 F.2d 119 (2 Cir. 1965).

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent. I am unable to reconcile the majority's arguments here and in United States v. Cone with the language of the Escobedo opinion:

"It is argued that if the right to counsel is afforded prior to indictment, the number of confessions obtained by the police will diminish significantly, because most confessions are obtained during the period between arrest and indictment, and

'any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.' Watts v. Indiana, 338 U.S. 49, 59 [69 S.Ct. 1347, 1357, 93 L.Ed. 1801] (Jackson, J., concurring in part and dissenting in part). This argument, of course, cuts two ways. The fact that many confessions are obtained during this period points up its critical nature as a 'stage when legal aid and advice' are surely needed. Massiah v. United States, supra, 377 U.S. at 204 [84 S.Ct. 1202]; Hamilton v. Alabama, supra [368 U.S. 52, 82 S. Ct. 157, 7 L.Ed.2d 114]; White v. Maryland, supra [373 U.S. 59, 83 S. Ct. 1050, 10 L.Ed.2d 193]. The right to counsel would indeed be hollow if it began at a period when few confessions were obtained. There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice. Our Constitution, unlike some others, strikes the balance in favor of the right of the accused to be advised by his lawyer of his privilege against self-incrimination. See Note, 73 Yale L.J. 1000, 1048–1051 (1964)." 378 U.S. at 488, 84 S.Ct. at 1763.

"Nothing we have said today affects the powers of the police to investigate 'an unsolved crime,' Spano v. New York, 360 U.S. 315, 327 [79 S.Ct. 1202, 1209] (Stewart, J., concurring), by gathering information from witnesses and by other 'proper investigative efforts.' Haynes v. Washington, 373 U.S. 503, 519 [373 U.S. 503, 83 S.Ct. 1336, 1346]. We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with

his lawyer." 378 U.S. at 492, 84 S.Ct. at 1766.

The investigation had focussed upon Robinson, as the arrest and search, and the testimony on probable cause therefor, demonstrate. Even though the statements may have been voluntary and the result of "routine" questioning, I believe that Escobedo requires us to hold that under the Sixth Amendment they cannot be used in evidence unless Robinson had been informed of his right to counsel and had voluntarily waived that right. It is true that a factual distinction may be made since Escobedo had asked to see his lawyer, but it would seem strange doctrine to hold that the constitutional right to counsel is lost if the accused is so poorly educated as to be ignorant of its existence, but preserved if he knows enough to demand it.

The majority lays much stress on the voluntary-involuntary test, ignoring the fact that Escobedo makes this a question of a Sixth Amendment right to counsel, as well as of the privilege against self-incrimination. Mr. Justice White, in dissent, strongly criticized the rule adopted in Escobedo precisely because it did enforce the Sixth Amendment right at so early a stage in a criminal process as the point when the accused became a suspect. I would not attempt here to turn back the clock and refuse so to interpret the Escobedo rule or refuse to enforce it because some may consider it unwise. The decision on the scope of the constitutional right having been made by the Supreme Court, we merely prolong litigation and consequent uncertainty in law enforcement methods by upholding convictions vulnerable under the Sixth Amendment. I would reverse for new trial with the statements excluded.

ANDERSON, Circuit Judge (dissenting).

I dissent from the majority opinion because I interpret Escobedo v. Illinois, 378 U.S. 478, 78 S.Ct. 1758 (1964) to mean that, under the circumstances of this case, when Agent Giovino at about noon on September 17, 1962, started to question Robinson, Robinson's Sixth Amendment right to the assistance of counsel attached. Because Giovino failed to warn Robinson of his Fifth Amendment right to remain silent, to advise him that anything he said might be used as evidence against him and to warn him of his Sixth Amendment right to the assistance of counsel, and because Robinson was interrogated without actually having the assistance of counsel, which he had not waived and to which he was then constitutionally entitled, Robinson's inculpatory statement, that some of the money used by his co-defendant Anita Daniels to purchase the narcotics was his, should have been excluded.

At that point Robinson had been in police custody and under arrest for an hour and twenty minutes. He had been taken to the police station. The search of his person and his baggage had been concluded. There was sufficient evidence for a finding of probable cause for the arrest of Robinson and his presentation before a commissioner. The investigation was continued through the questioning by Agent Giovino, in the presence of Serg't Gavin, neither of whom had participated in Robinson's arrest or the search of his person or baggage. The questions were not incidental to the arrest or the search but were a process of interrogation the purpose of which was to get an admission from Robinson of his financial participation in the purchase of the narcotics. Gavin testified concerning the questioning of Robinson by Giovino as follows:

"Q. Could you tell us what the conversations were? A. Agent Giovino asked Robinson whose money was used in New York City to purchase the narcotics that were found on Anita. George said it was hers.

Q. Pardon? A. Robinson said it was her money.

\* \* \* \* \* \*

Q. What else was said, if anything? A. Giovino then asked the

question, 'Do you mean to tell me that you went all the way to New York and back with her, and none of your money was in there?' Robinson replied, 'Some of the money was mine.'"

The general principle for which Escobedo stands is stated at the end of the opinion where the Court said, "[w]e hold only that when the process shifts from investigatory to accusatory—when it is focused on the accused and its purpose is to elicit a confession—our adversary system begins to operate, * * *." The Court then went on to say that under the facts and circumstances of the case before them the accused, Escobedo, should have been permitted to consult with his lawyer. We cannot very well limit the significance of Escobedo to recurrences of exactly the same facts and ignore the statement of the general principle or pretend it isn't there. The problem is, of course, to apply the principle to differing fact situations.

It is particularly difficult to determine in a specific case the precise time when the right to the assistance of counsel takes hold. After it has, unless the suspect "competently and intelligently" waives his rights, any statements resulting from the interrogation must be excluded at the trial; and in most cases, if the suspect has not been properly warned, there is nothing in the evidence to show that he had knowledge of the rights he is supposed to have waived. In considering when the right to counsel attaches, the words "when the process shifts from investigatory to accusatory" invoke the mental concept of the complete cessation of one clearly conceived kind of interrogation and the adoption of another kind, equally clear, but quite distinct in nature and purpose. The duty of the police to investigate, however, commences with notice that a crime has been committed and only ends at the close of the evidence in the trial itself, although pertinent interrogation of an accused who does not have the assistance of counsel terminates at his preliminary examination mandated under Rule 5, Fed.R. Crim.P., or his acquisition of counsel, whichever first occurs. Moreover, whatever the subject matter of the questioning may be, or whatever course it may take, the investigators are undoubtedly hopeful and desirous of obtaining a quick solution of the crime by getting a full confession or admission of inculpatory facts, and the intent to accomplish this is never far below the surface. In this sense all interrogation of a suspect or of one arrested for crime is a process "that lends itself to eliciting incriminating statements," but this is not in itself reprehensible and is consistent with the investigator's duty. Neither of these considerations, standing alone, brings a case within the scope of Escobedo. Under its rationale as Judge Waterman and I understand it, the Sixth Amendment right to counsel attaches somewhere between the arrest and the Rule 5 proceedings, just when and where, depends on the circumstances of each case. It attaches after sufficient evidence has been uncovered to constitute probable cause and after supplemental questioning of a casual nature (i. e., short of "a process of interrogation" characterized as a grilling) incidental to the arrest or a search and seizure, and close to it in time and place. It attaches when, thereafter, the interrogation becomes accusatory. Escobedo holds that the course of the questioning becomes accusatory when it is directed at the suspect with the assumption that he is the guilty person, and the nature and tone of the questions or the surrounding circumstances make it reasonably clear that the investigator is trying to get him to confess that he is the guilty person. It is then that "[the] adversary system begins to operate * * *." Although Escobedo had not been indicted or even formally charged, the Supreme Court said that he "had become the accused." That is to say, he had become the accused in the eyes of his interrogators. Likewise, it is apparent from the questions directed at Robinson by Giovino, that in the eyes of

Giovino, Robinson had become the accused.

All of the essential factors upon which the Escobedo decision rested[1] are present in this case with the exception of one, and that is that "the suspect has requested and been denied an opportunity to consult with his lawyer." It seems very unlikely that the Supreme Court intended that the absence of this factor would render the holding inoperative. The constitutional right to counsel does not depend on a formal request. Carnley v. Cochran, 369 U.S. 506, 514, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); Harvey v. State of Mississippi, 340 F.2d 263, 269 (5 Cir. 1965); U. S. ex rel. Russo v. State of New Jersey, 351 F.2d 429 (3d Cir. 1965). There could be no waiver because there was no warning and no evidence that Robinson was aware of his right to counsel.

In Williams v. United States, 345 F.2d 733, 735 (D.C.Cir. 1965), Judge Burger in a concurring opinion said,

"Its [Escobedo's] concern is to exclude the incriminating statements of a defendant whose situation meets the carefully articulated tests set out above [footnote 1]: his own uncounseled incriminating words may not be used against him at trial if they were elicited by purposeful police interrogation without prior warning of his right to silence and right to counsel."

In the case of United States v. Cone, decided today by this court, and in which I concurred in the result, there were a number of features which distinguish it from the present case of United States v. Robinson. In Cone the confession by the accused was made within a few minutes of the time when he was apprehended and arrested. It occurred a short distance from the place of arrest while the accused and the narcotics agents were waiting on the sidewalk for a government automobile to pick them up. When taken into custody, Cone had told the agents that someone must have put the bottle of marijuana in his coat; Cone also denied having seen the package, containing marijuana, which was under his chair at the place where he was arrested; he had denied all knowledge of both items of narcotics. While waiting on the sidewalk Agent McNeil spoke to Cone as follows:

"I asked him, I said, I told him that we knew that the package was for him. We had had information that it was, and we had delivered it to him, and it was delivered to him by one of the—by the party who had gotten it and he told us it was for him, and he says, Well, he said, 'All right, I'll admit it that it was for me,' that he had gone down to Panama just a couple of weeks, just prior to that, and he had made this arrangement to—

Q. Tell us, in his words. A. He said he had gone down to Panama with the express purpose of making a dollar out of this deal. He had gone down to Panama and he had set up before he went to send the packages to three people; that was Moser, Spencer and Kenneth Kaufman.

Q. Did he tell you how many packages he sent? A. He said he sent ten. It was eight, eight or ten, he wasn't sure.

---

1. "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution * * *." Escobedo v. Illinois, supra, 378 U.S. at 490, 491, 84 S.Ct. at 1765.

Q. Did he say anything else? A. He said that there was several more packages in his apartment and he agreed that we go over there and get them."

The agent was pointing out to Cone that the Government had information in direct contradiction to Cone's disclaimer of any knowledge of the matter. It was a casual conversation induced by the accused's own statements. It was incidental to the detention and arrest and does not fall within the proscription of Escobedo which does not prohibit the police from questioning a person detained to give him an opportunity to explain himself and to assure themselves that they have the right man. It was not "purposeful police interrogation" aimed at extracting from the accused incriminating statements, as was Agent Giovino's questioning of Robinson. McNeil, Cone's interrogator, had, unlike Giovino, participated in the arrest of Cone and knew first hand the circumstances of the arrest and what was said and done by Cone. The conversation between Agent McNeil and Cone was a natural outgrowth and response to those circumstances. Such a casual conversation, incidental to the arrest, and at a very early stage of the investigation, even though it resulted in a confession by the suspect, was not "a process of interrogation" which had become "accusatory" or signalized the beginning of "the operation of the adversary system." In the present case, however, the questioning of Robinson was. In the light of Escobedo he was entitled to the assistance of counsel, but he was neither advised of his right, nor did he have the opportunity to get counsel, nor did he, in fact, have one present. Under those circumstances his inculpatory statement should have been excluded.

The judgment of conviction should be reversed and the case should be remanded for a new trial. Judge Waterman concurs in this opinion.