Aaron **BOHROD**, Petitioner,

v.

**UNITED STATES** of America and Michael J. Wyngaard, Acting United States Attorney for the Western District of Wisconsin, Respondents.

No. C–65–15.

United States District Court
W. D. Wisconsin.

Dec. 14, 1965.

John L. Palmer, of Whyte, Hirschboeck, Minahan, Harding & Harland, Milwaukee, Wis., for petitioner.

Michael J. Wyngaard, Asst. U. S. Atty., Madison, Wis., for respondents.

JAMES E. DOYLE, District Judge.

On April 4, 1963, petitioner was 55 years old, a member of the faculty of the University of Wisconsin known as its artist in residence, a native citizen of the United States, a high school graduate who had then attended a junior college for one year and had had about four years of professional art school training.

On about January 15, 1963, petitioner received a phone call from a revenue agent, John F. Suby. An appointment was made for a conference January 16, 1963, which was held. In the course of this phone call and initial conference, petitioner was informed that the Internal Revenue Service proposed to audit his federal income tax returns for certain years. Petitioner was cooperative. At

the January 16 conference and on a number of occasions thereafter, prior to about February 10 (that is, "several days before" February 12), petitioner made available to Suby cancelled checks, checkstubs, some checking account statements from the bank, a so-called "investment book" containing information about purchases and sales of stocks, and some records concerning the cost of construction of a studio in his home. At the January 16 conference petitioner disclosed the identity of two of the galleries to or through which he had sold paintings during the years in question. (The identity of another party which had commissioned some paintings was disclosed some time between January 16 and April 4.) Petitioner afforded Suby considerable opportunity to examine these records and to make notes about them. Some of this work was done by Suby in an upstairs office of the studio, while petitioner worked in the studio below. Petitioner also gave Suby permission, without limitation, to examine the bank records of petitioner at the Madison Bank & Trust Company. During this period there were numerous conferences and phone conversations between Suby and petitioner.

On February 12, 1963, a conference occurred at which Suby and petitioner were present and, for the first time, petitioner's attorney, Joseph Goodman. Petitioner had called Goodman several days earlier, when petitioner had grown apprehensive about the extent and nature of Suby's investigation. From February 12 to March 7, 1963, the pattern of cooperation between petitioner (now represented by counsel) and Suby continued. At no time did Suby raise any question whether Goodman had a power of attorney or a "treasury card" then required of attorneys desiring to represent taxpayers in federal tax matters. Forms were executed extending the limitations period within which the government might act with respect to certain tax years. On February 26 Suby informed petitioner and Goodman that, applying the so-called "bank deposit method", he had found an apparent understatement of income.

Thereafter: (a) petitioner arranged for Suby to check petitioner's account with his stock broker, and also arranged for Suby to check on a record of bonds which petitioner had sold through the First National Bank of Madison; and (b) Goodman volunteered information to Suby concerning three savings account deposit books not previously made available.

On March 7, 1963, Suby referred the case to the Intelligence Division of Internal Revenue Service because, having applied the bank deposit method, he had concluded that there had been substantial amounts of income unreported by petitioner and that these discrepancies indicated fraud. From March 7 to April 4 Suby consciously avoided communications from petitioner and Goodman without explaining his inaccessibility.

On March 28, 1963, Special Agent Robert E. Ristow of the Intelligence Division, to whom the case had been assigned, conferred with Suby about it; they met again April 3. Suby informed Ristow on March 28 that petitioner had retained Goodman in connection with the audit, and that Suby had been dealing with Goodman. On April 3 it was decided that the two agents would call on petitioner at his studio on April 4, unannounced. The explanation given by the agents at the hearing for not telephoning Goodman in advance was that Goodman had no power of attorney. They offered no intelligible explanation for their failure to telephone petitioner in advance.

In his amended petition, petitioner alleges that at the opening of the April 4 conference at his studio, Ristow was introduced by Suby as a Special Agent; that Ristow repeated that he was a Special Agent and stated that his role in the audit was to investigate and determine whether certain of petitioner's returns were fraudulent and whether criminal prosecution appeared to be warranted. At the hearing on the amended petition, petitioner testified that after having asked three or four questions of no critical importance, Ristow said: "By the way, if any of these questions tend

to discriminate against you, you need not answer them", and "You may take the Fifth Amendment." The latter statement, according to petitioner, was made with "a conspiratorial sneer", apparently intended to discourage petitioner from availing himself of the Fifth Amendment. Except for the matter of Ristow's "sneer", there is no significant dispute as to the propositions stated in this paragraph.

There is sharp dispute as to two points in connection with the April 4 conference:

First, as to the absence of a lawyer. Petitioner contends: that following the introductions and Ristow's explanation of his purpose, petitioner stated that he felt that his lawyer should be present; that Ristow expressed surprise that petitioner had a lawyer; that Ristow said it wasn't important to have a lawyer present because Ristow intended to ask only questions of "historical" background as to which a lawyer could be of no assistance; that Goodman specifically could be of no assistance to petitioner because Goodman lacked a power of attorney or a treasury card; and that "if I did have my lawyer at my side, I might be subject to a kind of injury which might come about from a widespread knowledge of the fact that I was being investigated, and that I wouldn't be the beneficiary of such publicity." Ristow, corroborated by Suby, generally denies petitioner's version and contends: that after having presented his written credentials for petitioner's inspection and after having stated the warnings described in the preceding paragraph, Ristow said that he was aware of Goodman's participation in the audit and that petitioner could inform Goodman of Ristow's appearance in the case if petitioner wished; that petitioner said it would not be necessary to call Goodman; that the discussion about a power of attorney or treasury card for Goodman did not occur until after the question and answer period had been concluded; that, also following the questioning, it was petitioner who raised the question about publicity, but not in relation to the presence or absence of a lawyer. It is uncontradicted that petitioner had a telephone in his studio.

Second, as to allegedly incriminating statements made by petitioner. Petitioner contends: that he relied on the representation by Ristow that the questions would be "historical"; that he had no reason to think the questions actually asked (including questions about the names of galleries to which or through which he had sold paintings or about the names of parties which had commissioned paintings) were other than "historical" or that the answers to such questions would later be considered incriminating; that Ristow was working from several typewritten sheets of questions; and that he had felt at the time that he had no choice other than to proceed with the interview. Ristow, again corroborated by Suby, generally denies petitioner's version and testifies: that he told petitioner that he proposed to question him on "historical" matters and other matters; that he worked from four typewritten pages of questions covering both "historical" matters and other matters; and that in the course of the questioning he had not advised petitioner when the questions changed from an "historical" to a non-"historical" nature. The typewritten questions or points, received in evidence, number 48. Points 1 through 3 are: "purpose of visit; advise taxpayer of constitutional rights; determine if cooperation will be furnished during the investigation." Items 4 through 16 may be considered "historical" or biographical. Question 17 is: "What books and records maintained in connection with business?" Items 18 through 48 (to all of which

petitioner responded) are clearly non-"historical" and non-biographical and include such points as: what does petitioner do with receipts from paintings; names of banks and savings and loan associations with which petitioner had done business; loans received and made; gifts or inheritances received; real estate purchases and investments; safety deposit boxes; life insurance; living expenses; method of preparation of tax returns; and similar topics. The length of the conference was about two hours and fifteen minutes.

On April 8, Ristow phoned petitioner and arranged another conference at petitioner's studio for April 9. Ristow and petitioner agree that in this phone conference, petitioner said that Goodman had complained about the failure to notify him of the April 4 conference. Petitioner alleges that Ristow then repeated "that if my lawyer were there with me it would open the way for broader knowledge of this investigation and I might not enjoy the ensuing publicity." Ristow denies this, and alleges that he told petitioner that Goodman could be present April 9 but, because of the absence of a power of attorney, could be present only when petitioner was also present.

On April 9 the conference did occur at petitioner's studio. Petitioner, Goodman, Ristow and Suby were present. It is agreed that Goodman objected to Ristow about the failure to notify him of the April 4 conference, and that Ristow's explanation was that he had been prevented from calling Goodman first because Goodman had no power of attorney. Ristow also states that he had then told Goodman that on April 4 Ristow had advised petitioner that petitioner could call Goodman if he wished. The April 9 conference lasted about 45 minutes. Ristow inquired particularly about petitioner's income from the sale of paintings and about records of such sales. It was agreed that Goodman would file a power of attorney, that Ristow would provide Goodman with a list of the records desired, and that Goodman would see that the records were made available. Later on April 9 Goodman phoned Ristow to inquire about the procedure for filing a power of attorney and for obtaining a treasury card.

This proceeding was commenced to enjoin the United States and the United States Attorney from using any evidence procured at the April 4 conference and also any other evidence obtained or derived therefrom. Its more immediate objective was to prevent the government from using such evidence to obtain an indictment against petitioner.

■ A motion to dismiss the amended petition was denied on the ground that an "independent proceeding" of this kind, aimed at keeping evidence from a grand jury, is proper. Perlman v. United States, 247 U.S. 7, 13, 38 S.Ct. 417, 62 L.Ed. 950 (1918); Burdeau v. McDowell, 256 U.S. 465, 474, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); Cogen v. United States, 278 U.S. 221, 225, 49 S.Ct. 118, 73 L.Ed. 275 (1929); In re Fried, 161 F.2d 453, 1 A.L.R.2d 996 (C.A.2d, 1947). It is desirable that the court be adequately informed of the facts before dealing with the amended petition on its merits. In re Fried, supra, at 460; Austin v. United States, 297 F.2d 356 (C.A.4th, 1961).

Petitioner had embarked upon vigorous discovery procedures, invoking the rules of civil pre-trial procedure to take the depositions of the two revenue agents. The United States Attorney advised the agents to decline to answer the bulk of the questions, on the general ground that the proceeding is essentially criminal and that discovery limits should be those available to a defendant in a criminal action. An order was sought to compel the agents to answer. It appeared that endless controversy would stem from efforts, outside the courtroom, to test civil rules and concepts against criminal rules and concepts. Therefore, the court brought the matter directly before it for a hearing on the merits of the amended petition. This procedure did little to alleviate the inherent awkwardness of the proceeding, but it did per-

mit the frequent and troublesome issues of evidence and procedure to be resolved by the court promptly. Three days of testimony was taken concerning the circumstances in which the April 4 interview occurred; documentary exhibits were received; briefs and oral argument were considered. Because of the imminence of a certain limitations date, the court then entered a brief order on November 29, 1965, dismissing the amended petition on its merits, with the explanation that more detailed findings and conclusions would follow. Such findings and conclusions are contained in this opinion and order.

Since the court has concluded that the amended petition should be dismissed, it has not been necessary to proceed to a contemplated second stage of hearings. The purpose of such a second stage would have been to determine the nature and extent of the tainted evidence which might have been kept from the grand jury.

This recitation of the proceedings has been set forth at some length to provide a foundation for an observation. The observation is that the matter of pre-indictment remedies requires extensive study, and that it may be desirable to codify some rules in this area. The reported decisions thus far have dealt most inadequately with the contradictions inherent in a civil proceeding whose very purpose is to inhibit or prevent a criminal prosecution. It is troublesome, for example, that in seeking protection against unjust indictment, a petitioner appears to carry a heavy burden of proof from which he may be excused when he invokes similar protections after indictment.

Petitioner contends that, in the setting of events from January 15 through April 9, the language and conduct of Ristow and Suby on April 4 constituted fraud and deceit, and that by reason of this fraud and deceit: (a) petitioner's right to the effective assistance of counsel as guaranteed by the Sixth Amendment was violated; and (b) petitioner's right against self-incrimination as guaranteed by the Fifth Amendment was violated.

(a) *Right to Counsel.*

Petitioner's principal reliance is on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

In Massiah, the petitioner had been indicted, had retained a lawyer, and had pleaded not guilty and been released on bail. While petitioner was free on bail, one Colson, who was a co-defendant in the indictment, now cooperating with government agents, engaged petitioner in a lengthy conversation in Colson's car. By pre-arrangement with Colson, and without the knowledge of the petitioner, a federal agent had placed a listening device in Colson's car and thus heard certain incriminating statements by petitioner. The Supreme Court held that testimony by the agent concerning petitioner's incriminating statements could not constitutionally be used against petitioner at his trial. To permit its use would be to deprive petitioner of a right guaranteed by the Sixth Amendment, namely, the right to counsel at each stage after indictment.

In Escobedo the petitioner, a 22 year old of Mexican extraction, had been arrested in Chicago, handcuffed, and taken to police headquarters. He repeatedly asked to speak to his lawyer; his lawyer insistently sought leave to speak to him; both were refused. One DiGerlando had accused the petitioner of the murder in question, and petitioner was being pressed to admit it. During the persistent interrogation he remained handcuffed in a standing position. Eventually he made a damaging statement. In a 5 to 4 decision, the Supreme Court held (378 U.S. 478, at 490–491, 84 S.Ct. 1758, at 1765):

"that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a proc-

ess of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment * * * and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

Certain discussion in the dissenting opinion of Mr. Justice Stewart in Escobedo, 378 U.S. 478, 493–494, 84 S.Ct. 1758, 1766–1767, has prompted a definition of the problem as marking the "point at which a criminal investigation has ended and adversary proceedings have commenced." "It is at this point that the constitutional guarantees attach which pertain to a criminal trial. Among those guarantees are * * * the assistance of counsel." In United States v. Robinson (November 22, 1965, 354 F.2d 109), the Court of Appeals for the Second Circuit warns that rigid delineation between "criminal investigation" and "adversary proceedings" is not realistic. Preoccupation with such a delineation may transform Escobedo's striving for the heart of the matter "into a rigid and mechanistic formula." See concurring opinion of Judge Kaufman in Robinson.

With such caution in mind, certain gross delineations may nevertheless be made. In Massiah the "point at which a criminal investigation has ended and adversary proceedings have commenced" was marked at indictment; in Escobedo, at arrest, in the circumstances there. Massiah offers no support to the petitioner here who, of course, had not been indicted as of April 4. Escobedo offers no direct support since petitioner had not been arrested as of April 4. The controversy since Escobedo centers on whether, following arrest, there is still flexibility in determining right to counsel. See Robinson, supra; United States ex rel.

Russo v. New Jersey, 351 F.2d 429 (C.A. 3d, 1965). Whether, prior to arrest, right to counsel attaches, either flexibly or automatically, is an issue not reached by Massiah, nor by Escobedo.

Nevertheless, petitioner here urges that the necessary thrust of Escobedo carries prior to arrest. Petitioner urges that by April 4, 1963, the investigation by Ristow and Suby was "no longer a general inquiry into an unsolved crime" but had "begun to focus on a particular suspect"; that the "process [had] shift[ed] from investigatory to accusatory"; that "its focus [was] on the accused and its purpose [was] to elicit a confession." Escobedo, 378 U.S. 478, 490, 492, 84 S.Ct. 1758, 1765, 1766.

Escobedo concerned a murder. Importing its language into an income tax evasion case produces anomalies. When a man has been shot and witnesses describe the circumstances of the shooting, there is reason to believe that a crime has been committed. The crime is "unsolved" because the identity of the perpetrator has not been determined. But when civil investigator Suby concluded that a taxpayer had not reported substantial amounts of income which he had apparently received, there was no question about the identity of the putative offender; the question then centered on the soundness of Suby's initial conclusion, and, if sound, on the circumstances surrounding and possibly explaining the failure to report. The investigation had "begun to focus on a particular suspect," it is true, but whether a crime had occurred was still "unsolved." See Kohatsu v. United States, C.A.9th, October 22, 1965, 351 F.2d 898. See also Irwin v. United States, 338 F.2d 770, 777–773 (C.A.9th, 1964).

Here, as in Massiah and Escobedo, the court is called upon to consider many factors in fixing the point at which the constitutional right to counsel attaches. Perhaps Escobedo permits, though it clearly does not require, that the point be fixed prior to arrest. But if the point is sometimes to be fixed prior to arrest, the circumstances must be far more com-

pelling than these. To fix that point —geographically, psychologically, and sociologically—in the studio of a 55 year old, educated artist-in-residence and faculty member of a university is to fix it too far from the vital center of civil liberty. To fix that point, chronologically, at the moment when a criminal investigator joins a civil investigator in a tax case is too stringently to inhibit the search for the truth and too heavily to burden law enforcement.

■ The Sixth Amendment was not operative in petitioner's studio April 4, 1963. Petitioner enjoyed no constitutional right to counsel at that place and time.

■■ It is true that the power of the federal courts to formulate rules of evidence is not limited to enforcement of constitutional strictures. Evidence may be barred even though the circumstances in which it was obtained do not offend the Constitution. The federal courts have the duty of "establishing and maintaining civilized standards of procedure and evidence." McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943); Cicenia v. Lagay, 357 U.S. 504, 508–509, 78 S.Ct. 1297, 2 L.Ed. 2d 1523 (1958).

This court entertains no uncertainty as to Ristow's major purpose in deciding deliberately not to give petitioner warning of the April 4 visit. It was to circumvent petitioner's able and reputable counsel with whom Suby had worked closely for three weeks. The tactic is not admirable. Whether use of its fruits offends "civilized standards of procedure and evidence" is arguable. However, this court is not prepared to impose upon investigative agents the equivalent of the ethical rule among lawyers which prevents a lawyer from talking to an opposing party in the absence of the latter's attorney. See White, J., dissenting in Massiah, 377 U.S. 201, 210–211, 84 S.Ct. 1199.

(b) *Privilege against Self-incrimination.*

The Fifth Amendment, unlike the Sixth, was operative in the studio April 4.

■■ It is conceded that Suby's official status had been fully known to petitioner for weeks before April 4, and that Ristow's identity as a Special Agent with the Intelligence Division of Internal Revenue Service was made fully known at the beginning of the interview. Nor is there dispute that petitioner was clearly advised that Ristow's assignment was to determine whether petitioner's returns were fraudulent and whether criminal prosecution was appropriate. Finally, there is no dispute that petitioner was expressly advised that he had a right not to incriminate himself and that petitioner could invoke the Fifth Amendment. (It is insignificant that Ristow may have said "discriminate", and courts can hardly be expected to weigh vocal inflections and facial expressions not heard and seen directly.) The warnings and advice actually given here are not constitutionally required in such an interview of a taxpayer by revenue agents. United States v. Spomar, 339 F.2d 941, 942 (C.A. 7th, 1964) (decided subsequently to Massiah and Escobedo).

Moreover, for more than seven weeks this petitioner had been in close touch with his lawyer concerning Suby's investigation. Some five weeks before April 4 he and his lawyer had been informed of Suby's conclusion that income had gone unreported. These danger signals, these reminders of his Fifth Amendment rights, would have been more than adequate for a person far less mature and sophisticated than petitioner, in a setting far less comfortable and secure than petitioner's familiar, telephone-equipped studio. By the time the questioning commenced on April 4 petitioner was aware both of his jeopardy and his rights.

In the face of these circumstances, and having in mind petitioner's burden in this injunctive proceeding, to demonstrate that petitioner's waiver of his

Fifth Amendment right was not voluntary and intelligent is a formidable undertaking. Nevertheless, he persists, and on two grounds.

■ The first is that he was tricked into talking by Ristow's assurance that the questions would be merely "historical" in nature. It is unnecessary to resolve the conflict in testimony whether Ristow did in fact assure petitioner that the questions would be merely "historical." Of the 48 prepared questions and groups of questions, the last 32 were instantly recognizable as non-historical and non-biographical. It is not credible that, as the questions were actually put, petitioner would have relied, and would have continued to rely, upon Ristow's initial assurance even if it had been given.

■ The second ground is more complex. It centers on the absence of counsel. We have already concluded that the Sixth Amendment right to counsel, independently, was inoperative at the April 4 interview. However, the presence or absence of counsel is a factor to be considered in determining whether waiver of the Fifth Amendment privilege against self-incrimination is voluntary and intelligent. This overlapping of the concept of the right to counsel and the concept of the privilege against self-incrimination runs through the cases. Escobedo, 378 U.S. 478, 491, 84 S.Ct. 1758; United States ex rel. Russo v. New Jersey, 351 F.2d 429, 434-435 (C.A.3d, 1965); United States v. Robinson, 354 F.2d 109 (C.A.2d, 1965); see Sutherland, "Crime and Confession," 79 Harv.L. Rev. 21, 36 (1965).

As Enker and Elsen comment ("Counsel for the Suspect", 49 Minn.L.Rev. 47, 60-61 (1964)), the expansion of the right to counsel in Massiah and Escobedo will require hard re-evaluation whether the Fifth Amendment right is the right not to confess or the right not to be compelled to confess. Perhaps it is not enough that the right be waived voluntarily and knowingly; perhaps it can be waived only after an opportunity to discuss with counsel the tactical implications of the decision to talk or not to talk. For reasons indicated below, it appears unnecessary in the present case to determine whether Massiah and Escobedo so amplify and extend the meaning of the Fifth Amendment.

■ Petitioner's contention, although not fully articulated, seems to be that: he was tricked and threatened out of calling his attorney; had he called his attorney, Goodman would have advised him for tactical reasons not to talk; and that had petitioner received this advice from his attorney, he would have acted on it.

As indicated, to prove this sequence is a formidable burden. Petitioner has failed to discharge it, even if it is assumed—it is not so decided—that Ristow made the statements attributed to him.

That petitioner acted in response to the alleged tricks is not credible. As already indicated, if he had in fact refrained from calling his attorney because Ristow had characterized the questions in advance as merely "historical", he might reasonably be expected to have changed his mind when he was actually asked questions instantly recognizable as non-"historical." If Ristow did say that Goodman, even if present, could not be helpful because he had neither a power of attorney nor a treasury card, petitioner might reasonably have been expected to phone Goodman and inquire whether Ristow's statement was accurate. The more so, since petitioner and Goodman had then been in close and frequent communication for more than seven weeks.

Nor is it credible that petitioner acted in response to the alleged threat. The alleged threat itself—namely, that "widespread knowledge" of the investigation might follow from the presence of Goodman—is ambiguous. Was it that Ristow would spread the knowledge? Or Goodman? Or that the presence of a lawyer would spell controversy and that controversy would spell publicity? Whatever it may have been, petitioner might reasonably have been expected to phone Goodman to inquire whether this statement, as well, was accurate.

Even if we were to assume, however, that petitioner refrained from phoning Goodman because of the alleged tricks and threat, the court may not also assume automatically that Goodman's advice would have been not to talk. Petitioner's consistent pattern from January 15 to April 4 had been to answer questions and to provide the information requested. Whether this response, from January 15 to about February 10, was wise, we cannot say. But the pattern persisted after petitioner had consulted counsel on about February 10; even after both petitioner and counsel had been informed explicitly on February 26 of Suby's conclusion that income had gone unreported; and, indeed, even after the disputed April 4 conference. Moreover, this response at the very first interview with Suby on January 16 had included information concerning the channels of sale of paintings, although less fulsome than that provided April 4. A general assumption may be warranted that in many, perhaps most interrogation situations, counsel's tactical advice would be to remain silent. But against the backdrop of events here, petitioner may not discharge his burden by having the court assume that, had Goodman been called April 4, his tactical advice then and later would have been to withhold the information sought. Finally, the court may not make the ultimate assumption, against this same backdrop, that petitioner would have accepted such tactical advice from Goodman had it been given.

Had counsel been present April 4 and had petitioner then proceeded to answer Ristow's questions as he did, the presence of counsel might have been a factor pointing to the conclusion that petitioner's waiver of his privilege against self-incrimination was voluntary and intelligent. Perhaps the absence of counsel April 4 may be a factor pointing to the conclusion that petitioner's waiver of his privilege against self-incrimination was not voluntary and intelligent. But it is no more than this, no more than a factor to be weighed against the many opposing factors already listed: the consistent pattern of cooperation and disclosure; the earlier, continued opportunity for consultation between petitioner and his counsel; the clear explanation of Ristow's identity and purpose; the explicit advice by Ristow to petitioner with respect to petitioner's privilege against self-incrimination; the unmistakably non-"historical" and non-biographical nature of the questions themselves. Balancing these factors, the petitioner has failed to prove that his waiver of his privilege against self-incrimination was not voluntary and intelligent.

Therefore, it has been ordered on the 29th day of November, 1965, and it is now confirmed that the amended petition herein be dismissed with prejudice; that the respondents be awarded their costs and disbursements as required by law; and that the injunctive provisions contained in paragraph 5 of the order entered herein on October 25, 1965, be withdrawn.