**UNITED STATES of America,**
**Appellee,**

**v.**

**Richard CONE, Appellant.**

**No. 450, Docket 29345.**

United States Court of Appeals
Second Circuit.

Argued April 30, 1965.

Submitted to the In Banc Court
May 26, 1965.

Decided Nov. 22, 1965.

J. Joseph Smith, Circuit Judge, dissented.

Neal J. Hurwitz, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, Michael W. Mitchell and Lawrence W. Newman, Asst. U. S. Attys., New York City, on the brief), for appellee.

Robert Kasanof, New York City, for appellant.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and ANDERSON, Circuit Judges.

LUMBARD, Chief Judge.

The question for decision is whether Richard Cone's statements made to customs agents on the street a few minutes after his arrest were properly admitted at his trial. The agents did not advise Cone of his right to remain silent and that what he said might be used in evi-dence. Cone did not ask to consult counsel prior to making the statements, nor was he advised of his right to do so. We hold that the statements were admissible and affirm the conviction.

Cone was tried under an indictment charging him with smuggling marijuana into the United States in violation of 21 U.S.C. § 176a. He was tried with two co-defendants, Larry Spencer, who was charged with possession of marijuana when no transfer tax had been paid in violation of 26 U.S.C. § 4744(a), and David Moser, who along with Cone and Spencer was charged with conspiring to violate 26 U.S.C. § 4744(a).[1] Cone was found guilty of smuggling and was sentenced to the mandatory minimum five years imprisonment. Spencer was found guilty of unlawful possession and was given a suspended two-year sentence with a six-month probation. Spencer filed a notice of appeal, but the appeal was not prosecuted and has been dismissed.

The facts are as follows: On October 3, 1963, customs agents in Miami intercepted two packages which had been sent airmail from Panama. Finding that the packages contained marijuana, they resealed them and forwarded them to New York for delivery to the addressees, defendants Spencer and Moser. Customs agents were present when a mailman delivered one package to Moser at his home at 116–18 Grosvenor Lane in Queens on October 7. Moser invited the agents into his apartment and during the ensuing conversation the agents saw a strainer and bowl used to manicure marijuana. Moser then admitted that he knew marijuana was in the package and that Cone had mailed it to him from Panama; he said that Cone had phoned him that morning and asked that he deliver the marijuana to Cone at the Marshall Brown Rehearsal Studios, 247 West 72nd Street, Manhattan, when it arrived. The agents placed Moser under arrest.

1. Count Three of the indictment charged Cone, Spencer, and Moser with conspiracy to violate 26 U.S.C. § 4744(a). Count Four charged that Cone conspired with Spencer and Moser, who were named as co-conspirators but not as defendants, to violate 21 U.S.C. § 176a. Judge Murphy dismissed both counts at the conclusion of the government's case.

Meanwhile, other customs agents had observed the delivery of the other package to Spencer at his home at 167 West 88th Street, Manhattan. Spencer first denied knowledge of the package. When the agents noticed marijuana "seeds" on a coffee table, they arrested him. A search of the apartment produced additional marijuana; Spencer then admitted that he had agreed to have Cone mail him the package from Panama in exchange for "a piece of the package."

As Moser agreed to deliver his package to Cone, several agents went with Moser to the Marshall Brown Studios area. Moser went in with the package; he came out about fifteen minutes later and reported that he had delivered it to Cone. The agents then entered the studios and identified themselves. Cone told agent Edward Coyne that he knew nothing about a package that had been delivered that day. When the package delivered by Moser was found under a chair in which Cone had been sitting, Cone denied ever seeing it, and agent Coyne arrested him. In Cone's coat, which was on a nearby chair, agent George Neilson found a small bottle containing marijuana of which Cone also denied knowledge, saying that someone must have put it there.

The agents then walked three or four blocks with Cone to a rendezvous point on Riverside Drive near 73rd Street. During the walk and while they were standing on the street waiting for a government automobile, agent Leonard McNeil engaged Cone in conversation. He told Cone that two witnesses had said that Cone had sought their permission to mail them the packages from Panama. He told Cone that "if he did cooperate with us I would call it to the attention of the

U. S. Attorney, [but] that I could make him no promises." Cone then stated that he had mailed at least eight packages containing marijuana to Spencer, Moser, and one Kenneth Kaufman, and that his purpose had been to make "a dollar out of this deal."

Before trial Cone moved to suppress the seizure of the marijuana at the Marshall Brown Studios after his arrest on the ground that there had been no probable cause for his arrest, and to suppress a subsequent seizure of marijuana at his apartment. When the case was called for trial, Judge Murphy took testimony of the customs agents on this motion. Judge Murphy found probable cause for the arrest, a result that Cone does not question on this appeal. Judge Murphy also sustained the seizure at the studios; he suppressed the seizure at Cone's apartment on the ground that Cone had not freely given his consent to the search.[2] It is clear that the agents had probable cause to believe that Cone had smuggled marijuana into the United States and that their arrest of Cone and seizure of the package at the studios were lawful.

Cone urges on this appeal that the admission of his post-arrest statements made to government agents who failed to warn him of his rights to silence and counsel violated his Fifth and Sixth Amendment rights, as recently interpreted by the Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)[3] Cone argues that when the statements were made he had become the "target" of the agents' investigation and that, since the purpose of the questioning was to elicit an incriminating statement, his response could not be used as he had not

2. Spencer and Moser had also moved to suppress evidence seized at their homes when they were arrested, and the preliminary hearing included testimony on these motions. Judge Murphy denied the motions of both Spencer and Moser.

3. At no time during the trial, or during the hearing on the motion to suppress, did Cone or any of the defendants deny that the admissions used against them had actually been made. In addition to

the preliminary hearing on the motions to suppress, a *voir dire* was held during the testimony of the agents at trial to determine the voluntariness of the admissions. All three defendants testified during the *voir dire* out of the jury's presence. They all invoked the Fifth Amendment when asked whether the statements had actually been made, and no one of them took the stand in the presence of the jury.

been warned. Cone does not seriously argue that the statement was in fact involuntary.

■ This appeal thus raises the question whether the circumstances under which Cone made his admission required that the agents advise him of his right to keep silent, his right to counsel, and that what he said might be used in evidence, and whether their failure to so advise was a violation of Cone's constitutional rights such that the trial court should have excluded the admission. After argument before a panel of this court, the active judges on their own motion, on May 26, 1965, ordered that this case, along with six others, be considered *in banc*. We hold that under all the circumstances there was no violation of any of Cone's constitutional rights in eliciting the statements, that the agents had no duty to advise Cone of any right to counsel or to remain silent, and, accordingly, that the statements were properly admitted and the conviction should be affirmed.

In our view, Cone's inculpatory statement to Agent McNeil was given voluntarily under circumstances which did not create any feeling that Cone was compelled to answer on pain of suffering physical or psychological mistreatment. We find no basis for any claim that such a brief and routine inquiry gave Cone reason to fear the consequences if he failed to speak. The conversation took place while the agents and Cone were walking from the studios on West 72nd Street to a point near Riverside Drive and 73rd Street—a distance of four blocks—and during the few additional minutes spent waiting for a government car. Nothing in the record suggests any threat or any display of weapons or any attempt to place Cone in fear. Nor is there any claim that Cone was suffering from any physical disability, such as influence of narcotics, during the questioning. Moreover, it appears from Cone's testimony during the *voir dire* at trial that he was 27 or 28 years old and had attended college for one and one-third years.

■ Nor is there any substance to the claim that Cone was improperly induced to speak by a promise of leniency. Agent McNeil's statement to Cone that "if he did cooperate with us I would call it to the attention of the U. S. Attorney"—to which McNeil added that he could make no promises—was a proper and accurate statement of fact. Of course, the agents wanted Cone to tell what he might know and it was natural that they should extend the invitation in a way which pointed out a possible advantage of disclosure. What was said was no more than the obvious. Cf. Ashdown v. State of Utah, 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958). We find nothing in the Due Process or Self-Incrimination clauses of the Fifth Amendment, as written or interpreted, that requires us to exclude from evidence an admission made under all the circumstances of this case.

The agents did what was required by all accepted police practices and what any citizen would have expected them to do under the circumstances when they questioned Cone fairly and noncoercively. Their duty was to secure all available information bearing upon the importation of marijuana and those who might be implicated. This required that they question Cone as they had questioned Moser and Spencer; of course, meaningful questioning involved explaining to Cone what they knew about his receipt of the package of marijuana.[4] Whether Cone would implicate Moser and Spencer or any others, whether he could absolve himself, they could not know. In fact, Cone admitted that he had asked Moser and Spencer to receive the packages and bring them to him and, in addition, he gave the name of a fourth person, Kaufman.

It was the duty of the agents to question Cone and all others who might be concerned regardless of whether they al-

---

4. Of course, immediate questioning is of benefit to an innocent suspect, for it offers him an opportunity to explain away incriminating circumstances and to gain his release after a minimum of detention and inconvenience.

ready had enough information to justify Cone's arrest—as it is conceded that they had here—and regardless of whether, by any test, they had enough evidence to prosecute. It has been suggested [5] that the process of questioning suspects may be dissected into "investigatory" and "accusatory" phases and that certain legal conclusions, such as whether the Sixth Amendment's right to counsel "attaches" and requires that the suspect be advised of his rights to silence and counsel, should flow from a judicial finding that police questioning has passed beyond mere investigation. We do not consider this a realistic doctrine for most cases. It was not the job of the agents questioning Cone, nor were they qualified to make nice decisions about the sufficiency of the evidence they possessed; nor could they at the time of arrest determine what charges should be formally made and against whom. Agents in hot pursuit of those whom they have reason to believe may be implicated in a crime which has just been discovered cannot be required "on the spot" to decide difficult questions of the sufficiency and quantum of proof.

We think a judicial inquiry into whether the agents were still in the "investigatory" stage when they arrested Cone, and whether what had started out as an investigation had reached the "accusatory" stage when Cone was questioned immediately after his arrest, would serve no useful purpose. What may seem to be sufficient evidence at one stage of an investigation may become quite insufficient when those who have supplied information are themselves accused and become unavailable to the government as witnesses, as happened with Moser and Spencer in this very case. To make judicial assessment of the questioning process turn on whether questioning occurred when a case was no longer in the "investigatory" stage and had entered the "accusatory" stage would force police officers to make momentary and critical decisions so unrelated to the actualities of law enforcement that the entire police function might well be significantly undermined or demoralized.

It is also urged that Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758 (1964), now requires the federal courts to extend the Sixth Amendment right to the assistance of counsel to the questioning of any suspect when he is arrested and that the suspect must then be advised of his right to silence and to counsel before being questioned. We do not agree and we find nothing in Escobedo which supports such a rule or which requires its extension to defendants who are questioned immediately upon their arrest. Text, context and history of the Sixth Amendment [6] lead to the conclusion that the framers were addressing themselves to judicial proceedings, where a person is obliged to defend himself in a process fraught with the technicalities and procedural niceties of the criminal law.[7] This protection has been extended to preliminary hearings before a magistrate, also part of the criminal prosecution.[8]

---

5. See United States ex rel. Russo v. New Jersey, 351 F.2d 429 (3 Cir. No. 14833, May 20), petition for rehearing denied in banc, Oct. 13, 1965 (8–1). Other circuit courts have differed widely in their interpretation of the Supreme Court's decision in Escobedo v. Illinois. Compare, e.g., Kennedy v. United States, 353 F.2d 462 (D.C.Cir. 1965); Collins v. Beto, 348 F.2d 823 (5 Cir. 1965); United States v. Childress, 347 F.2d 448 (7 Cir. 1965); Wright v. Dickson, 336 F.2d 878 (9 Cir. 1964). See also Pennsylvania ex rel. Craig v. Maroney, 348 F. 2d 22 (3 Cir.), petition for rehearing denied in banc, 3 Cir., 352 F.2d 30 (Nov. 2, 1965) (6–3).

6. "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

7. See Enker and Elsen, Counsel for the Suspect: Massiah v. United States and Escobedo v. State of Illinois, 49 Minn. L.Rev. 47 (1964).

8. See White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

■ Of course, the lack of counsel and the failure to advise an accused that he has the right to counsel before speaking have been considered in many cases decided prior to Escobedo to be relevant factors in determining the voluntariness of statements made by an accused prior to his arraignment.[9] But in these cases, there were factors not present here, such as questioning for many hours, often with an ignorant or physically weakened suspect; incommunicado detention; lack of sleep and food; threats of violence and sometimes actual violence; and so forth. While Escobedo may have extended the Sixth Amendment's protection by shifting the focus of the examination by which the admissibility of prearraignment statements is tested, that decision cannot be divorced from its particular facts; we would be misreading Escobedo if we extended it to embrace every inculpatory statement, made prior to arraignment and without full warning, by any person whom the police suspected of crime.[10] Wherever the bar created by the Escobedo decision may ultimately be held to fall, it does not come so early in the process of police investigation as the interrogation here.

Until Escobedo it had never been seriously urged that the mere failure to advise a suspect of his right to remain silent and his right to counsel would of itself, absent other factors evidencing unfairness or coercion, invalidate the use of any statement made thereafter by the accused. Compare Crooker v. State of California, 357 U.S. 433, 441, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958) (dissenting opinion). So far as federal practice is concerned, and so far as state practice was concerned until some recent state court extensions of language in Escobedo, the police of this country have not made it a practice to give such warnings.[11] We

9. See, e. g., Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Spano v. New York, 360 U.S. 315, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959); Leyra v. Denno, 347 U.S. 556, 561, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945).

10. Of course, Federal Rule of Criminal Procedure 5(a) prevents the police in a federal prosecution from abusing their freedom to question a suspect by unnecessarily prolonging the period of detention prior to arraignment so as to elicit a confession, a factor clearly present in the state prosecution of Danny Escobedo. To enforce the proscription of Rule 5 (a), the Supreme Court has formulated the McNabb-Mallory exclusionary doctrine pursuant to its general supervisory powers over federal prosecutions. Even if this court could exercise this supervisory power and require federal officers to give the three-part caution, we see no occasion to do so because we consider the McNabb-Mallory rule to be a sufficiently objective and more satisfactory method of assessing the fairness of the questioning process and of imposing sanctions where necessary. See, e.g., United States v. Middleton, 344 F.2d 78 (2 Cir. 1965).

11. But, cf. Tex.Ann.Code Crim.Proc. art. 727 (Vernon 1941) (enacted 1907), which provides that a confession taken from a person in police custody is inadmissible unless either the suspect is warned that he may remain silent and that what he says may be used in evidence, *or* the confession contains a statement of facts which are shown to be true and which "conduce to establish his guilt."

State court decisions after Escobedo are divided on the question of whether under the circumstances failure to advise a suspect of his right to counsel constituted sufficient ground for reversal when an incriminating statement had been admitted. The cases that have answered this question affirmatively include People v. Dorado, 40 Cal.Rptr. 264, 394 P.2d 952 (1964), cert. denied, 381 U.S. 937, 85 S.Ct. 1765, 14 L.Ed.2d 702 (1965); State v. Neely, 239 Or. 487, 395 P.2d 557 (1964); and State v. Dufour, 206 A.2d 82 (R.I.1965) (alternative holding). Among those decided the other way are People v. Hartgraves, 31 Ill.2d 375, 202 N.E.2d 33 (1964), cert. denied, 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed. 2d 152 (1965); Commonwealth v. Tracy, 207 N.E.2d 16 (Mass.1965); People v. Gunner, 15 N.Y.2d 226, 257 N.Y.S.2d 924 (1965); Parker v. Warden, 236 Md. 236, 203 A.2d 418 (1964); and State v. Winsett, 205 A.2d 510 (Super.Ct.Del.1964).

are aware that for some years it has been the practice of the Federal Bureau of Investigation so to advise, but the Federal Rules of Criminal Procedure have recorded no such requirement. We find nothing in the language or prior interpretations of the Federal Constitution, or in reason, which requires that every person suspected of crime be advised of his rights to silence and to counsel, failing which *any* statement thereafter made is inadmissible.[12] See United States v. Wilson, 264 F.2d 104 (2 Cir. 1959).[13]

We are not persuaded that any of the provisions of our Federal Constitution, interpreted in the light of necessities of our day, dictates a constitutional rule that a suspect must be advised of his rights to silence and the advice of counsel immediately upon his arrest and before he is questioned or makes any statement to the police. It may well be that Congress[14] or the Supreme Court through its rule-making power at the sufferance of Congress will, after appropriate study, make rules requiring such warning and advice under certain circumstances in future cases.[15] Rules so adopted would be subject to change and modification in the light of experience and thus would be a far more flexible means of regulating police practices and of imposing any needed sanctions.

We note further that any inquiry into the desirability and need for a rule requiring such warning and advice must face the likelihood that in most cases such warning would cause the accused to say nothing. Either the accused would invoke the right to silence, or, after he availed himself of the right to consult counsel, his counsel would most certainly enjoin him to silence.[16]

---

12. In England, police investigation is regulated by the Judges Rules, a guide to both the police and the courts promulgated and periodically reviewed (the latest revision was effective January 27, 1964) by the Judges of the Queen's Bench. The Rules require, *inter alia*, that police officers caution a suspect of his right to silence and that anything he says may be used "as soon as a police officer has evidence which would afford reasonable grounds for suspecting that a person has committed an offense." However, it is within the discretion of English judges to admit a reliable confession given during a questioning session in which a minor departure from the Rules, such as a failure to caution, has occurred. See, e.g., Regina v. Buchan, [1964] 1 Weekly Law Rep. 365 (Ct.Crim.App.); Regina v. Straffen, [1952] 2 Law Rep. 911 (Q.B.D.). See generally, Culombe v. Connecticut, 367 U.S. 568, 593–598, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The result of the English practice, therefore, greatly resembles that which flows from our decision in this case.

13. We disagree with assertions that the failure to caution a suspect of his rights is necessarily parallel to the refusal of the request for counsel condemned in Escobedo. The refusal of Danny Escobedo's request to consult with a counsel he had already retained and whom he knew was in the station house emphasized the hostile nature of the interrogation and brought home to the suspect his isolation and lack of support. See Crooker v. State of California, 357 U.S. 433, 438, 78 S.Ct. 1287 (1958).

14. In the Criminal Justice Act of 1964, 18 U.S.C.A. § 3006A(b) (Supp.1964) Congress provided that an accused must be advised of his right to counsel when he is arraigned before a United States Commissioner.

15. A study of pre-arraignment procedures, including the detention and questioning of suspects, is now being conducted by the American Law Institute and a Special Committee of the American Bar Association. Of course, requiring new procedures through statute, rules or code has the important advantage that all those concerned can be given suitable advance notice of when new requirements are to become effective; thus, time can be allowed for the adjustment to new methods and for the promulgation of pertinent instructions.

16. A further problem with a rule requiring that those arrested be immediately advised of their right to counsel is that in most large cities of the United States more than 50% of those accused of serious crime are financially unable to retain counsel. Moreover, nowhere in the United

Mr. Justice Frankfurter, writing for the majority in Culombe v. State of Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), recognized the restrictive effect which such warning and advice would have on law enforcement:

"But if it is once admitted that questioning of suspects is permissible, whatever reasonable means are needed to make the questioning effective must also be conceded to the police. * * * Legal counsel for the suspect will generally prove a thorough obstruction to the investigation. Indeed, even to inform the suspect of his legal right to keep silent will prove an obstruction. Whatever fortifies the suspect or seconds him in his capacity to keep his mouth closed is a potential obstacle to the solution of crime." 367 U.S. at 579–580, 81 S.Ct. at 1866–1867.

Mr. Justice Jackson had earlier pointed out in Watts v. State of Indiana, 338 U.S. 49, 59, 69 S.Ct. 1347, 1358, 93 L.Ed. 1801 (1949), that "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to the police under any circumstances."

The fact is that in many serious crimes —cases of murder, kidnapping, rape, burglary and robbery—the police often have no or few objective clues with which to start an investigation;[17] a considerable percentage of those which are solved are solved in whole or in part through statements voluntarily made to the police by those who are suspects.[18] Moreover, immediate questioning is often instrumental in recovering kidnapped persons or stolen goods as well as in solving the crime. Under these circumstances, the police should not be forced unnecessarily to bear obstructions that irretrievably forfeit the opportunity of securing information under circumstances of spontaneity most favorable to truth-telling and at a time when further information may be necessary to pursue the investigation, to apprehend others, and to prevent other crimes.[19]

Until the need for immediate advice is properly evaluated in light of the probable detrimental effect of such a requirement—an inquiry that cannot adequately be undertaken by courts examining the facts of particular cases—we think it highly undesirable to lay down a rule which would deprive the police of the opportunity to question suspects and to use such statements as are found to have been given voluntarily and to have been procured fairly. In our country, a most

States is there any workable procedure for making assigned counsel available on short notice to meet situations such as would arise in cases where the suspect asks for counsel and is unable to provide his own counsel.

17. See, e.g., the facts in Culombe v. State of Connecticut, 367 U.S. 568, 81 S.Ct. 1860 (1961); United States ex rel. Daniel v. Wilkins, 292 F.2d 348 (2 Cir. 1961), cert. denied, 372 U.S. 917, 83 S.Ct. 731, 9 L.Ed.2d 723 (1963).

18. A three-month study of police performances in two California cities in 1960 revealed that between 75 and 90% of all persons charged with crime had given confessions or admissions after what the author termed "surprisingly short" periods of interrogation. See Edward L. Barrett, Jr., Police Practices and the Law—From Arrest to Release or Charge, 50 Calif.L. Rev. 11, 35–44 (1962). See also Hear-

ings on H.R. 7525 and S. 486 before the Senate Committee on the District of Columbia, 88th Cong., 1st Sess. 443 (1963) (statement of David Acheson, United States Attorney).

At the May, 1965 Judicial Conference for the Second Circuit, Michael J. Murphy, then Police Commissioner of the City of New York, said that analysis of 1963 and 1964 New York City murder cases disclosed that 50% of those which had been solved had been solved in whole or in part by a confession.

19. We also note the many authorities who consider the great bulk of voluntary confessions to be wholly reliable. See, e.g., Hopt v. State of Utah, 110 U.S. 574, 584, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (first Mr. Justice Harlan); 3 Wigmore, Evidence § 866, at p. 357 (3d ed. 1940). See also Devlin, The Criminal Prosecution in England, 31–62, 77–80 (1958).

valuable right of law-abiding citizens who make up the great majority of our people is the right to be protected against law breakers and criminal interference with their liberty and property. This right can be enjoyed only if those who have the responsibility for law enforcement are able to apprehend and prosecute an appreciable percentage of wrongdoers and solve an appreciable percentage of serious offenses. A time such as the present, when there is grave and growing public concern about the increasing ineffectiveness of law enforcement,[20] and when there is growing legislative concern about the proper scope of the rights of persons accused of crime, is not a time for the courts to stifle or preempt the attempts to reach a reasoned compromise by announcing novel doctrines, constitutional or otherwise, or by extending old doctrines, in novel ways, so that law enforcement will be further crippled and made more difficult.

The right of the police to ask questions in the hope of eliciting truth is in keeping with our most precious moral values, that the guilty should confess their guilt and that the truth should be told. See United States ex rel. Williams v. Fay, 323 F.2d 65, 72 (2 Cir. 1963) (concurring opinion), cert. denied, 376 U.S. 915, 84 S.Ct. 667, 11 L.Ed.2d 611 (1964). It is not surprising that the impact of incriminating evidence in the hands of the police often produces a strong compulsion to speak [21] and that immediate questioning

upon the finding of evidence and the arrest of a suspect is most likely to produce truthful admissions from the guilty. Judge Madden, writing for a unanimous panel of this court in United States v. Wilson, supra, expressed this in a manner peculiarly applicable to this case:

"It is not an evil thing for one accused of crime to voluntarily admit his guilt. It is a good thing. It removes his crime from the list of unsolved crimes and enables the police to get about the task of solving other crimes on the list. It enables the Criminal Courts and their juries to reach decisions free from the uncertainties which trials involving principally circumstantial evidence involve. It brings down upon the accused no worse than is his due, the punishment prescribed by law for his crime.

If the activities of the police were of a sporting nature, they might well spurn the assistance which a voluntary admission of guilt gives them, or at least discourage it by suggesting to the accused that he should not lighten their task. They might in effect tell him that in the contest between them, as the protectors of society, and those who are accused of crime, they always win, and are therefore quite indifferent as to whether they win easily, as by default, or after the contest is played out to the end.

---

20. President Johnson recorded this public concern in a message entitled "Crime, Its Prevalence, and Measures of Prevention," submitted to Congress on March 8, 1965. The President said, in part: "Crime has become a malignant enemy in America's midst. * * * No right is more elemental to our society than the right to personal security and no right needs more urgent protection. Our streets must be safe. Our homes and places of business must be secure. * * * We are not prepared in our democratic system to pay for improved law enforcement by unreasonable limitations on the individual protections which ennoble ou system. Yet there is the undoubled [sic] necessity that society

be protected from the criminal and that the rights of society be recognized along with the rights of the individual." U.S. Code Congressional and Administrative News, 89th Cong., 1st Sess. 241–242 (1965).

21. Most persons, even hardened criminals, will not refuse to cooperate altogether. See, for example, United States v. Bufalino, 285 F.2d 408 (2 Cir. 1960), where, of 58 persons who were stopped for questioning about their 1957 meeting at Joseph Barbara's estate in Appalachin, New York, only one refused to answer any questions. Of the 58, about 25 had police records. United States v. Bonnano, 180 F.Supp. 71, 76 (S.D.N.Y.1960).

If the police said that, they would not be speaking the truth. They don't always, nor nearly always, solve crimes and bring the guilty to justice. They always have more useful things to do than to play the game of cops and robbers out to the end when they could have won it by letting the arrested person talk.

We feel no urge to elevate to the dignity of a Constitutional right a practice which, perhaps even as a matter of etiquette, may, in the present condition of society, be an unwarranted extravagance." 264 F.2d at 106.

We are not unmindful that a major test of our society's dedication to the guiding principles of our government, imperishably proclaimed both in the Declaration of Independence and the Constitution, particularly in the Bill of Rights, lies in the protections which are accorded the individual in defending himself against a charge of crime prosecuted by the government, federal or state. Nor can it be seriously disputed that, without the injunctions of Supreme Court decisions dating from the 1923 landmark case of Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543, it would be thought today by the overwhelming majority of interested citizens that we had failed to pass this test. Those decisions, and the doctrines which have flowed from them, have measurably improved the humanity of our administration of criminal justice; they have won general acceptance because the bench and bar were already committed to the standards on which those decisions were grounded, and it was not too great a step to give universal application to measures which already prevailed in most states. Moreover, many of those decisions merely required sanctions against practices already beyond the pale of the law.

Were our courts to adopt the argument of the appellant and to proscribe all questioning of suspects without advising them of their rights and thus, in effect warning them not to speak, we would be over-turning practices which have obtained universally and for which neither the states nor the federal government are prepared to compensate by alternative measures. Indeed, it has nowhere been satisfactorily suggested by any proponent of warning before any questioning just how law enforcement could effectively continue to operate if routine and necessary questions were to be preceded by a warning which, from its nature, obstructs the inquiry for truth.

Richard Cone was fairly treated; he was questioned in accordance with the law and proper police procedures. He voluntarily made a statement to government agents and there is no reason to believe that it was not truthful. His constitutional rights were not violated by the admission of such relevant evidence. His conviction should stand.

MOORE, FRIENDLY, KAUFMAN and HAYS, Circuit Judges, concur.

WATERMAN, Circuit Judge (concurring in the result):

I concur in the result reached by six of my brothers. The court's opinion correctly states that this appeal queries whether the circumstances under which the defendant made his inculpatory statement required that his interrogators advise him of his right to keep silent, his right to counsel, and that what he said might be used in evidence against him. I concur with the court, and with my brother Anderson, that here, despite the officers' failure to so advise, appellant's inculpatory statements were properly admitted against him at his trial and the conviction should be affirmed for the reasons so ably stated by my brother Anderson in his dissenting opinion in United States v. Robinson, 354 F.2d 116 (2 Cir. 1965).

Nevertheless, I should also make a separate statement in order to make it quite clear that I disassociate myself from much of the language that purports to support the court's opinion. Although I agree that the facts of this case do not

demonstrate the existence of compulsion, and therefore there was no violation of the Fifth Amendment's guarantee against self-incrimination, I cannot subscribe to that part of the court's opinion that drastically curtails the protection provided by the assistance of counsel clause in the Sixth Amendment.

On the ground that this is not "a realistic doctrine for most cases," 354 F.2d 123, the court flatly refuses to inquire whether at the time the inculpatory statements were made in answer to agent McNeil's questions the process of questioning this defendant had passed from the "investigatory" to the "accusatory" stage. Indeed, the court states that such an inquiry "would serve no useful purpose." Though the use of these particular adjectives by the U. S. Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758 (1964) leaves unresolved problems, some such test is presently essential to the hard process of deciding when the Sixth Amendment rights explicated by Escobedo first come into play. See, e. g., United States ex rel. Russo v. State of New Jersey, 351 F.2d 429 (3 Cir. 1965). I find it surprising that we toss off inquiry into this matter when the Supreme Court has mandated inquiry therein.

The court's position is that although Escobedo "may have extended the Sixth Amendment's protection * * * that decision cannot be divorced from its particular facts." 354 F.2d 124. And it is obvious that the majority, despite the significant language in Escobedo quoted by our dissenting brother, Judge Smith, in his dissent to United States v. Robinson, 354 F.2d 109, at 115, is holding

that the admissibility of inculpatory statements made by a suspect prior to the commencement of formal proceedings against him will not be dealt with by ascertaining whether the arresting officers are accusing him of criminality, but will be dealt with under the traditional rubric of "voluntariness," thereby avoiding the inquiry relative to the constitutional right to the assistance of counsel when the statement was elicited.[1]

I am dismayed that our court has refrained from facing up to the issues posed by Escobedo as applied to the facts of this case and those in U. S. v. Robinson, 2 Cir., 354 F.2d 109, decided this day. The opinions in Escobeda may well be "fraught with creative ambiguity,"[2] and it is proper to have a fair debate as to when the rights attach that are outlined there.[3] It is my belief that we are required to rule upon the admissibility against him at his trial of an accused's inculpatory statements made to officers by the test laid down in Escobedo. We cannot ignore that responsibility case by case or avoid it by holding that the inquiry would serve no useful purpose.

In this opinion ANDERSON, Circuit Judge, concurs.

FRIENDLY, Circuit Judge (concurring).

Although I generally agree with Chief Judge Lumbard's opinion, the issues here decided have been so much debated, and many judges and commentators seem to me to have read into Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758 (1964), so much more than that decision will fairly bear, that a brief statement of my position seems warranted.

1. Certainly dissenting Justices in *Escobedo* believed the opinion of the Court meant "abandoning the voluntary-involuntary test for admissibility of confessions." See dissenting opinions of Justice White, speaking for himself, Justice Clark and Justice Stewart, 378 U.S. 495 at 496, 84 S.Ct. 1767 at 1768, and separate dissenting opinion of Justice Stewart, 378 U.S. 493, 84 S.Ct. 1766.

2. Freund, Rationality in Judicial Decisions, in Nomos VII: Rational Decision 109, at 118 (Friedrich ed. 1964).

3. Several alternative statements of the "critical" stage at which time the rights conferred by Escobedo attach are spelled out in Kamisar, Equal Justice in the Gatehouses and Mansions of American Criminal Procedure, in Criminal Justice in Our Time 1, at 58–59 (1965).

Cone's case does not come close to those in which inculpatory admissions have been held "involuntary" and hence inadmissible on general due process grounds. See Culombe v. State of Connecticut, 367 U.S. 568, 81 S.Ct. 1860 (1960). Hence the only constitutional questions are whether his interrogation violated the Sixth Amendment's guarantee of the Assistance of Counsel or the Fifth's against self-incrimination.

The Sixth Amendment commands that "In *all criminal prosecutions, the accused* shall enjoy the right * * * to have the Assistance of Counsel *for his defence*." It was altogether consistent with the language and the known purpose of this clause [1] to hold it to be applicable at a preliminary hearing before a magistrate, as the Supreme Court did in Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), and White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963). Such a preliminary hearing is part of a "criminal prosecution," the suspect has become an "accused," and he is beginning his "defense." Equally clearly, an indictment or information marks a stage when a "criminal prosecution" has begun and a suspect has become an "accused"; such surprise as there was in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), lay in its holding that the Assistance of Counsel clause applied to questioning by a confederate acting at the government's behest, as it clearly would have to questioning by the prosecutor himself.

It would indeed make a mockery of these decisions if the police or the prosecutor could postpone the accrual of the precious right to the Assistance of Counsel by unduly delaying the initiation of the "criminal prosecution." This is the root principle of Escobedo v. State of Illinois, supra, as exemplified by the key statements that under the facts "Petitioner had become the accused * * *" 378 U.S. at 485, 84 S.Ct. at 1762, and "Petitioner had, for all practical pur-

poses, already been charged with murder," 378 U.S. at 486, 74 S.Ct. at 1762.

What is not always easy is to find when that "critical" stage, 378 U.S. at 486, 84 S.Ct. at 1762, has been reached. Police interrogation does not fall into two neat piles, one of which can be readily labeled "investigatory" and the other "accusatory." Although the very fact of arrest does show that in a sense the investigation "has begun to focus on a particular suspect," 378 U.S. at 490, 84 S.Ct. at 1765, I find no sufficient evidence that the Supreme Court has decided that at this early stage, when those authorized to make "accusations" often have not even been informed, every person arrested has already become an "accused," entitled to the full protection of the Assistance of Counsel clause; and the consequences of such a ruling would be so serious that an inferior court ought not to anticipate. Any such view would be wholly inconsistent with the Court's statement, 378 U.S. at 492, 84 S.Ct. at 1766, "Nothing we have said today affects the powers of the police to investigate 'an unsolved crime,' * * * by gathering information from witnesses and by other 'proper investigative efforts.' Haynes v. Washington, 373 U.S. 503, 519 [83 S.Ct. 1336, 1346, 10 L.Ed.2d 513]." Police questioning truly designed to find out about the crime and its ramifications does not cease to be "investigatory" because the police hope or even expect that the subject of the interrogation will inculpate himself. Such questioning is in sharp contrast to the hammering for the sole purpose of eliciting a confession of a crime already "solved" that is so nearly equivalent to extracting a plea of guilty at an arraignment as to fall within the "penumbra," see Griswold v. State of Connecticut, 381 U.S. 479, 483–484, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1964), of the Assistance of Counsel clause. Since the portion of the Escobedo decision dealing with the Sixth Amendment is readily and fairly distinguishable on this ground, we are not obliged to consider the much mooted ques-

---

1. See Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Cal.L.Rev.929, 943–944 (1965).

tion of the extent to which it also rested on the presence of Escobedo's lawyer in the police station and the thwarting of Escobedo's efforts to see him.

Rather similar considerations apply with respect to the argument based on the Fifth Amendment's guarantee against self-incrimination. If one were to look only to the words, "nor shall be compelled in any criminal case to be a witness against himself," there would be strong reason to believe that the Amendment has no application to interrogation by officers having no legal power to compel a person to speak.[2] But police or prosecutors ought not to be allowed to circumvent the Amendment through compelling, by physical or moral pressure, what a magistrate or a grand jury could not do by command. I take it that the Supreme Court so decided in Escobedo, 378 U.S. at 488, 84 S.Ct. at 1763, although without the discussion one would expect for an issue of such importance. On the other hand, the Amendment does speak in terms of compulsion; and the Court has surely not yet held, as feared by Mr. Justice Jackson in his dissent in Ashcraft v. Tennessee, 322 U.S. 143, 161, 64 S.Ct. 921, 88 L.Ed. 1192 (1944), that the mere facts of arrest, or even of detention in a police station, demonstrate the existence of compulsion. See Culombe v. State of Connecticut, 367 U.S. 568, 576, 578–580, 588–592, 81 S.Ct. 1860 (1961) (opinion of Mr. Justice Frankfurter).

Although difficult border-line cases in the application of these constitutional principles will necessarily arise, Cone's case is about as far from the border as one could be. It is true that when as here a federal appellate court is reviewing a federal conviction, it can insist on a greater degree of protection to the defendant than the Constitution compels.

To that end, pursuant to authority delegated by Congress, the Supreme Court has adopted Fed.R.Crim.P. 5, requiring that arrested persons be taken before a commissioner "without unnecessary delay" and has implemented this with the rule of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), excluding inculpatory statements during interrogation that is unnecessarily prolonged. Whether the Supreme Court may wish to go further and invoke its rule-making power to require that, in the future, federal officers must give warnings to arrested persons and, if so, what, when and how, and with what consequences for failure, is for that Court alone to say.

LUMBARD, Chief Judge, concurs in this opinion.

KAUFMAN, Circuit Judge (concurring):

I concur. Properly interpreted, Escobedo reflects a judicial determination to cut through formal distinctions and to disregard procedural niceties. As my Brother Friendly has observed, the Court in Escobedo was insistent that the actual commencement of a criminal prosecution would be determinative, whatever the time of formal indictment or arraignment. It would indeed be ironic if we were mechanically to invoke Escobedo here and thus to transform a concern for substance into a rigid and mechanistic formula. Instead, we must look behind the surface formalities and not permit ourselves to be distracted by descriptive labels or catch phrases which obfuscate the marrow.

I, therefore, agree with my Brothers LUMBARD and FRIENDLY.

---

**2.** See, for conflicting views, 8 Wigmore, Evidence § 2252, at 328–329 and n. 27; Morgan, The Privilege Against Self-Incrimination, 34 Minn.L.Rev. 1, 27–30 (1949); Note, The Privilege Against Self-Incrimination: Does It Exist in the Police Station?, 5 Stan.L.Rev. 457 (1953); 1 Morgan, Basic Problems of Evidence 146–148 (1961); Maguire, Evidence of Guilt § 2.03, at 15–16 (1959); Kamisar, Equal Justice in the Gatehouses and Mansions of American Criminal Procedure, Magna Carta Essays 25–32 (1965).

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent.

As indicated in my dissent in United States v. Robinson, decided today, I believe that Escobedo v. Illinois requires us to reverse this conviction, founded in part on Cone's statements to the agents after his arrest, when he had not been advised of his right to counsel or his right to remain silent. There can be no question but that the criminal process had shifted from investigatory to accusatory and had focussed upon Cone. The marihuana had been intercepted and followed to the addressees. They had given statements accusing Cone and detailing the planned delivery to Cone, thereupon carried out under the surveillance of the agents and followed to Cone's possession at the agreed place of delivery. The investigation was complete, the agents had learned that Cone had shipped the drug from Panama to himself at New York. Without limitation of the rights and duties of the agents to continue investigation as to the involvement of others, Escobedo makes it plain that the use against Cone of self-incriminatory statements elicited for that purpose by agents after he became the target of the investigation and had indeed been arrested for the crime and was without counsel is forbidden. The Constitution requires that his right to counsel be enforced unless competently waived—and there can be no serious claim of waiver here.

It is possible to read Escobedo very narrowly and confine it to its particular facts, but I submit that this does violence to the opinion's explanation of the rationale of the holding and to the dissenters' understanding of what the Court's opinion meant. Moreover, grudging inch by inch acquiescence can only prolong litigation and the uncertainty of enforcement officials and delay steps to improve promptness in assuring the provision of counsel and development of alternative investigatory techniques. I would reverse for new trial with Cone's admissions after arrest, in the absence of counsel, excluded.