**UNITED STATES of America**

**v.**

**Lawrence C. FRACTION.**

**Crim. No. 85–145.**

United States District Court,
D. New Jersey.

July 17, 1985.

W. Hunt Dumont, U.S. Atty., by Jeremy D. Frey, Asst. U.S. Atty., Newark, N.J., for the U.S.

John F. McMahon, Federal Public Defender by Richard Coughlin, Asst. Federal Public Defender, Camden, N.J., for defendant.

## OPINION

STERN, District Judge.

This matter comes before the Court on a motion to suppress by defendant Lawrence Fraction, who claims that a confession he made to Federal Bureau of Investigation Agent Henry W. White, Jr., was involuntary. An evidentiary hearing was held on June 5, 1985.[1] For the reasons stated below, defendant's motion is granted.

## FACTS

On September 21, 1984, Agent White traveled to Rahway State Prison in New Jersey, where Mr. Fraction had recently started serving a fifteen-year state sentence, in order to question Fraction about the 1983 armed robbery of the First People's State Bank of Woodbury, New Jersey. *United States v. Fraction*, Cr. No. 85–145, Tr. of June 5, 1985 at 5, 18 (D.N.J.) (henceforth cited as Tr. of June 5, 1985). Fraction was questioned in an interview room at the prison. *Id.* According to Agent White, as soon as he identified himself, "Mr. Fraction said something to the effect that: 'I was expecting you' or 'expecting you all.'" *Id.* at 6. White then had Fraction read his *Miranda* rights off "our form FD–395" and sign the waiver. *Id.* at 6–7. This form bearing Fraction's signature was introduced into evidence. The last sentence reads: "I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." *Id.* at 8. According to White, Fraction then stated that he was unwilling to testify against Samuel Hutchings. *Id.* And Fraction asked what he would get in return for cooperation. *Id.* at 16. Agent White testified:

At that time, I advised him that he would not have to testify against Mr. Hutchings.

I also told him that I would not be able to promise him anything in terms of help other than to notify the U.S. Attorney and a sentencing judge that he had cooperated in the matter. And that was the extent of what I could do for him.

*Id.* at 8.

Fraction proceeded to tell the story of the bank robbery, and the interview concluded after about one-half hour. *Id.* at 9. Agent White specifically denied making any promises relating to the sentence or treatment Fraction might get. *Id.* at 10. Finally, the Assistant U.S. Attorney introduced into evidence Mr. Fraction's "three-page rap sheet" showing "an extensive criminal history of both felony convictions and numerous arrests." *Id.* at 11.

Mr. Fraction's version of the meeting is very different. He denied saying he was expecting Agent White or someone from his office. *Id.* at 19, 24. According to Mr. Fraction, Agent White initiated the interview by saying, "Well, I'm sure you know why I'm here," and Fraction answered by denying any such knowledge. Agent White proceeded to report that he knew a lot about Fraction, and he knew that Fraction was involved in the March, 1983 bank robbery. *Id.* Fraction testified that he denied knowledge of the bank robbery and that he never indicated willingness to give a statement about the bank robbery. *Id.*

Mr. Fraction testified that Agent White intimated that it would "be better for me to go ahead and cooperate now, you know; that it would look better for me and possibly help me in my sentencing." *Id.* at 20. Agent White proceeded to mention a "tentative parole date of something in '87," of which Fraction was unaware. *Id.* Fraction confirmed that Agent White mentioned reporting cooperation to the U.S. Attorney and the judge, but Fraction claimed that White went on to say that "by my cooperating that I probably would receive a le-

---

1. This opinion is filed pursuant to Rule 28 of the General Rules of the United States District

Court for the District of New Jersey, and augments an oral opinion given from the bench.

nient sentence or a concurrent term." *Id.* Fraction said he signed the *Miranda* waiver only because of the representations made by White. *Id.* at 21, 23.

It is undisputed that the meeting was not witnessed, and that Agent White made no written or taped record of the interview.

## DISCUSSION

With due allowance for the frailty of human memory, the Court finds no reason to disbelieve Agent White's version of what was said at his meeting with Mr. Fraction. The Court finds no reason to believe that Agent White explicitly offered or discussed a light sentence or a concurrent sentence in order to induce Mr. Fraction to incriminate himself. Under the circumstances of this case, however, the Court finds little difference between such explicit promises of leniency and what Agent White himself acknowledges he did promise Mr. Fraction: That Fraction's cooperation would be brought to the attention of the prosecutor and the sentencing judge.

In *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), the Court held that *Miranda* warnings are merely evidence, not proof, that a defendant knowingly and voluntarily waived the constitutional privilege against self-incrimination. The test for voluntariness has been variously phrased. In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court asked whether defendant's statements were "the product of his free and rational choice." *Id.* at 401, 98 S.Ct. at 2418 (quoting *Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1153, 20 L.Ed.2d 77 (1968)). In *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), the Court asked, "Is the confession a product of an essentially free and unconstrained choice by its maker? ... [or has] his will been overborne, and his capacity for self-determination critically impaired[?]." *Id.* at 602, 81 S.Ct. at 1879. In *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), the Court's inquiry focused on whether the circumstances deprived the defendant of "the power of resistance." *Id.* at 198, 77 S.Ct. at 285.

■ In the usual situation, the question is whether the confession was induced by force, threats or fear, but there is no doubt that promises of leniency may also render a confession involuntary. *See Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (*per curiam* ); *Brady v. United States,* 397 U.S. 742, 753–54, 90 S.Ct. 1463, 1471–72, 25 L.Ed.2d 747 (1970) (dealing with analogous area of guilty pleas); *Shotwell Manufacturing Company v. United States,* 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963). In *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), the Court went considerably further than to say that such promises *may* render a confession involuntary:

> [A] confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, *nor obtained by any direct or implied promises, however slight,* nor by the exertion of any improper influence....

*Id.* at 542–43, 18 S.Ct. at 186–87 (emphasis added). The government urges us to believe that this standard is not the law today. The fact is, however, that *Bram* has never been overruled. *See United States v. Sibley,* 535 F.Supp. 208, 211 (E.D.Pa.), *aff'd,* 692 F.2d 750 (3d Cir.1982). The Supreme Court has continued to cite this specific passage from *Bram* with approval. *United States v. Raddatz,* 447 U.S. 667, 671, 100 S.Ct. 2406, 2410, 65 L.Ed.2d 424 (1980); *Hutto,* 429 U.S. at 30, 97 S.Ct. at 203; *United States v. Mandujano,* 425 U.S. 564, 586 n. 3, 96 S.Ct. 1768, 1781 n. 3, 48 L.Ed.2d 212 (1976) (Brennan, J., concurring); *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973).

■ The cases cited by the government do not suggest that *Bram* is overruled. They merely reject "wooden" application of *Bram. See United States v. Reynolds,* 532 F.2d 1150, 1158–59 (7th Cir. 1976); *Sibley,* 535 F.Supp. at 211–12. We agree that a "wooden" or literal application

of *Bram* is inappropriate. No bright line standard exists for determining the voluntariness of a confession. That determination must be made on the facts of each case, and "requires more than a mere color matching of cases." *Mincey v. Arizona,* 437 U.S. 385, 401, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978) (quoting *Reck v. Pate,* 367 U.S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948 (1961)). Whether a waiver of fifth amendment rights has occurred voluntarily must be determined in consideration of the "totality of the circumstances." *Fikes v. Alabama,* 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957); *see also North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979). Any number of factors have figured large in these determinations. *See Mincey,* 437 U.S. at 398, 98 S.Ct. at 2416 (defendant in pain from gunshot wound); *id.* at 409, 98 S.Ct. at 2422 ("relentless" questioning); *Davis v. North Carolina,* 384 U.S. 737, 742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966) (low intelligence of accused); *Spano v. New York,* 360 U.S. 315, 318–19, 79 S.Ct. 1202, 1204, 3 L.Ed.2d 1265 (1959) (police use of trickery to gain accused's sympathy for interrogator); *Crooker v. California,* 357 U.S. 433, 438, 78 S.Ct. 1287, 1291, 2 L.Ed.2d 1448 (1958) (age and education of accused); *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954) (psychiatrist used to subtly elicit confession).

The United States has brought to this Court's attention a number of decisions by Courts of Appeals outside the Third Circuit, holding that a promise to bring cooperation to the attention of the prosecutor was insufficient to render a confession involuntary. In all of these cases, however, the accused was at liberty when he was arrested and then questioned. *United States v. Hart,* 619 F.2d 325, 326 (4th Cir. 1980); *United States v. Fera,* 616 F.2d 590,

593 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980); *United States v. Posey,* 611 F.2d 1389, 1390 (5th Cir.1980); *United States v. Curtis,* 562 F.2d 1153, 1154 (9th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Springer,* 460 F.2d 1344, 1346 (7th Cir.), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); *United States v. Glasgow,* 451 F.2d 557, 558 (9th Cir.1971); *United States v. Frazier,* 434 F.2d 994, 995 (5th Cir.1970); *United States v. Cone,* 354 F.2d 119, 121 (2d Cir.1965), *cert. denied,* 384 U.S. 1023, 86 S.Ct. 1958, 16 L.Ed.2d 1026 (1966).[2]

■ Mr. Fraction, by contrast, was incarcerated in a maximum security penitentiary. He was in the first year of a fifteen-year sentence for another offense. We find this to be an important distinction from the cases cited in the government's excellent brief. The *Sibley* decision, which the government cites in support of its view that *Bram* has been limited, was itself limited as follows: "... [S]everal circuit courts have questioned the complete applicability of *Bram* to *non-custodial* questioning." 535 F.Supp. at 211 (emphasis added). We do not go so far as to hold that a custodial setting will always require a court to apply literally the *Bram* ban on confessions "obtained by any direct or implied promises, however slight." 168 U.S. at 542–43, 18 S.Ct. at 186–87. But we agree with the suggestion in *Sibley* that a custodial setting is highly relevant to determining how literally *Bram* should be read.

■ There is another unusual factor present here. Unlike most of the cases cited by the government, Agent White promised to bring any cooperation to the attention of the sentencing judge, as well as the U.S. Attorney.[3] Whereas a pledge

---

**2.** Nor was the accused incarcerated at the time of questioning in three other cases not discussed by the government. *United States v. Packer,* 730 F.2d 1151, 1154 (8th Cir.1984); *United States v. Vera,* 701 F.2d 1349, 1353–54 (11th Cir.1983); *United States v. Jacks,* 634 F.2d 390, 392 (8th Cir.1980).

**3.** In four of the circuit cases, the defendant was merely told that cooperation would be brought to the attention of the U.S. Attorney. *Fera,* 616 F.2d at 594; *Curtis,* 562 F.2d at 1154; *Frazier,* 434 F.2d at 995–95; *Cone,* 354 F.2d at 122. In one case, the accused was also told that cooperation might affect the amount of his bond.

to bring cooperation to the attention of the prosecutor might be construed as nothing more than "a proper and accurate statement of fact," *Cone,* 354 F.2d at 122, Agent White's suggestion that *he* would bring any cooperation to the attention of the sentencing judge is a different matter. First, such an assurance makes the suggestion of leniency far more palpable. Secondly, a direct communication between an FBI agent and a sentencing judge would be highly unusual. Perhaps Agent White had in mind the possibility that Fraction's cooperation would be reported to the sentencing judge by the U.S. Attorney or by the Probation Department in the Pre-Sentence Report. If so, however, Agent White promised that which he could not necessarily deliver.

In assessing the impact both of Agent White's remarks and of Mr. Fraction's incarceration, it is important to remember that, as the Fourth Circuit put it, "[t]he perspective from which the statements must be viewed is that of the defendant, not the prosecutor's." *Grades v. Boles,* 398 F.2d 409, 412 (4th Cir.1968). *See also United States ex rel. Thurmond v. Mancusi,* 275 F.Supp. 508, 516 (E.D.N.Y.1967) (Weinstein, J., ruling that "[i]f, at the time he pled guilty, the defendant believed that a coercive promise or threat had been made by either the court or the prosecutor, though in fact no such promise or threat had been made, and his plea was induced by this belief, it is an involuntary and void plea."); *United States ex rel. Casserino v. Denno,* 259 F.Supp. 784, 790 (S.D.N.Y. 1966) (Weinfeld, J., holding confession inadmissible where accused "reasonably understood" it as part of a bargain for leniency).

A pledge to bring cooperation to the attention of the sentencing judge might seem a small promise. Under the circumstances of this case, however, we find the promise meant a great deal to Fraction. Fraction asked White what he would get in exchange for cooperating. Tr. of June 5, 1985 at 16. White answered that he would notify the U.S. Attorney and the sentencing judge of the cooperation. *Id.* at 8. Only then did Fraction confess. *Id.* at 9. It is clear to this Court, after hearing the testimony, that Fraction thought he was making a deal whereby he would get a more sympathetic climate at sentencing in exchange for agreeing to confess to White. The Assistant U.S. Attorney acknowledged that Fraction thought he was getting an assurance that "things would happen in the way he anticipated." *Id.* at 39–40. The Assistant conceded his inability to supply another interpretation:

THE COURT: ...

I believe ... when both of them spoke ... they were speaking in a code. And the code says: Talk and we'll make it easier for you.

That's what the words mean. I defy you to give me another meaning to them. Would you like to?

MR. FREY: No, judge.

*Id.* at 40.

The plain truth is that the words the agent spoke were calculated to induce Fraction to waive his right to be silent by implying that he would get a break from the judge. An interrogating agent has no business invoking the spectre of a sentencing judge in order to induce a suspect to waive his right to silence.

---

*Hart,* 619 F.2d at 326. In three cases, the accused was told that cooperation would be brought to the attention of the U.S. Attorney and "the court." *Posey,* 611 F.2d at 1390; *Springer,* 460 F.2d at 1347; *Glasgow,* 451 F.2d at 558. In one case, the accused was told that cooperation would be brought to the attention of "the court." *Jacks,* 634 F.2d at 393. In two cases the accused was told that cooperation would be made known to "the appropriate authority." *Packer,* 730 F.2d at 1158; *Vera,* 701 F.2d at 1364.